**DISTRIBUTION SYSTEMS OF AMERICA, INC., Plaintiff,**

v.

**VILLAGE OF OLD WESTBURY, Defendant.**

**No. CV 91–5060 (ADS).**

United States District Court, E.D. New York.

Feb. 28, 1992.

Meltzer, Lippe, Goldstein & Wolf, P.C., Mineola, N.Y. (James P. Duffy, III, of counsel), for plaintiff.

Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, Uniondale, N.Y. by John M. Armentano, Barbara Quinn McElroy, for defendant.

## OPINION AND ORDER

SPATT, District Judge.

Much has been made of our Constitution's "most majestic guarantee" [1]—the freedom of speech. No doubt one of the more familiar theories of free speech is the often-quoted passage of Justice Holmes that "the best test of truth is the power of the thought to get itself accepted in the competition of the market" (*Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 [1919] [Holmes, J., joined by Brandeis, J., dissenting]).

It is the very "marketplace of ideas" theory that provides the foundation for the controversy now before the Court, namely, the distribution of a local newspaper. In addition to the right to freely circulate one's ideas, the law of the land also protects the public's right to receive those ideas (*see Authors League of America, Inc. v. Oman*, 790 F.2d 220, 223 [2d Cir. 1986]). With this in mind, the Court turns to the plaintiff's application.

The plaintiff moved by order to show cause, dated December 23, 1991, seeking a preliminary injunction and temporary restraining order pursuant to Fed.R.Civ.P. 65(a) and (b), enjoining the defendant Village of Old Westbury from "continuing, attempting or threatening to enforce Chapter 149 of the Code of the Village of Old Westbury or taking any action to prevent, interfere with, or threaten plaintiff, and its employees, agents, and assigns from distributing or otherwise delivering the newspaper entitled *This Week* to the residents of the municipal defendant."

### I.  FACTUAL BACKGROUND

The plaintiff Distribution Systems of America ("DSA") is engaged in the dissemination of newspapers, magazines and other periodicals. *This Week* is circulated to approximately 1.1 million homes in Nassau, Suffolk and Queens counties and is published in more than sixty different local editions.

According to the plaintiff, *This Week* is distributed exclusively by independent carriers, free of charge to Long Island residents. It contains "substantial timely and topical editorial content and news items of local and general interest and provides an important public service by, among other things, alerting the public in its circulation area to local and general news events, offering a medium of expression on issues of local concern and providing a conduit through which local merchants can make themselves and their goods and/or services known to their communities" (Duffy Affidavit, ¶ 5).

The plaintiff asserts that a sample issue of *This Week* contains items of local interest, including:

(1) a "Community Calendar"—lists and promotes events conducted by non-profit organizations, free of charge;

(2) "Community Briefs"—announcing births, graduations, engagements, weddings, and grand openings;

(3) "School News"—information on local schools;

(4) Various regular columns devoted to the home, fashion, cooking, lifestyles, automobiles and a profile of local merchants.

DSA also acknowledges that the paper contains a substantial number of advertisements. However, it notes that unlike larger regional newspapers, most of the ads in *This Week* call attention to local businesses operating in the small circulation areas for which each edition is targeted. The revenue generated by the ads allows the paper to be delivered free of charge.

### II.  PROCEDURAL SETTING

Chapter 149–4 of the Old Westbury Code provides as follows:

"**§ 149–4.  License required for certain activities.**

It shall be unlawful for any person, organization, society, association, company or corporation or their agents or representatives to proselytize, canvass or to distribute handbills, pamphlets or other written material or solicit donations or contributions of money or property or financial

---

1. Lawrence H. Tribe, AMERICAN CONSTITU- TIONAL LAW, § 12–1, at 576 (1978).

assistance of any kind upon the streets, in the offices of business buildings, upon private property, by house to house canvass or in public places in the Village of Old Westbury without a license previously issued pursuant to this chapter."

To qualify for a license, a person must file an application with the Mayor of the Village of Old Westbury. Section 149–5 outlines this procedure:

"A. Applications for a license, as provided for in this chapter shall be in writing and addressed to the Mayor of the Village of Old Westbury and shall contain the following information:

(1) Name, address and purpose of the cause for which the license is sought.

(2) Names and addresses of the officers and directors of the organization, firm, society, association, company or corporation.

(3) Time for which permission is sought and localities and places of activity.

(4) Legal and tax status of any organization, firm, society, association, company or corporation so applying.

(5) Whether or not any commissions, fees, wages or emoluments are to be expended in connection with such activity.

(6) *Such other information as the Board of Trustees may require*" (emphasis supplied).

The plaintiff further notes that:

"Pursuant to Chapter 149, the Village Board is exclusively authorized to issue licenses to distributors of newspapers upon receipt of a bona fide application. Thus, pursuant to this Chapter, the Village Board has the unfettered discretion to determine whether any additional information is required and to withhold issuance of the permit to any distributor of a newspaper" (Duffy Affidavit, ¶ 9).

The practical effect of this process, DSA maintains, is that every newspaper carrier would have to apply for and receive a license from the Village Board before he or she would be permitted to deliver *This Week.*

On this basis, DSA contends that Chapter 149 of the Old Westbury Code is (1) an unconstitutional prior restraint on the distribution of *This Week,* (2) an unconstitutional grant of broad discretion to the Village Board to withhold issuing a license to any *This Week* carrier, (3) an effective preclusion of the distribution of *This Week* by any uncertified substitute carrier [such as a mother, father, sister, etc. of the carrier], (4) a deprivation of the plaintiff's right to disseminate views on important matters, and (5) a deprivation of the rights of Old Westbury residents to receive those views. Ultimately, the plaintiff stresses, enforcement of Chapter 149 will result in termination of the services of numerous independent newspaper carriers and delivery persons, a corresponding financial loss to DSA, and the likelihood of termination of many DSA employees.

In response to the order to show cause, the defendant Village submitted the affidavits of three Village of Old Westbury officials.

### A. *Affidavit of Gilbert Colombo, Mayor*

Mr. Colombo states that he has been a village official since 1967 and has been Mayor since 1981. He contends that the plaintiff's case is based on "two fundamental fallacies: (1) that Chapter 149 gives the mayor and Board of Trustees unfettered discretion to grant or deny a license under Chapter 149, and (b) that the VILLAGE is exercising unconstitutional prior restraint of the Plaintiff's publications" (Colombo Affidavit, ¶ 2). According to Colombo, "neither contention is true, for the plaintiff has not been denied a license under Chapter 149" (*id.*).

In evaluating the "validity" of Chapter 149, Mayor Colombo adds that "the plaintiff could not be denied a license *if it supplied the simple information required in § 149–5(A), none of which can be considered confidential or intrusive*" (¶ 2) (emphasis supplied). This action, in Colombo's estimation, has been "concocted ... in the hope of putting financial pressure on the VILLAGE" (¶ 3).

Referring to two other actions brought by DSA in the Eastern District of New York, Colombo states that DSA's strategy has worked twice before—evident in the stipulations of settlement signed by the Villages of East Hills and Bayville. In urging the Court to deny this motion, Colombo raises three overriding issues:

1. that the plaintiff has "refused to discuss its concerns with the Village Board of Trustees" and since the plaintiff has not applied for a license under Chapter 149, it has *no standing* to bring this action;

2. that the *safety and privacy of the residents* of the Village are legitimate governmental concerns justifying regulation of the delivery of unsolicited written material as set forth in Chapter 149;

3. that the the plaintiff has been mailing *This Week* to residents and does not allege that it cannot continue to do so—"*i.e.*, it will not suffer irreparable harm by the denial of the preliminary injunction" (¶ 5).

In describing the make-up of the Village of Old Westbury, Mayor Colombo notes the following details:

"... upper middle class and prosperous [residents] understandably concerned about their personal safety and the prevention of any burglaries ... the VILLAGE residents have gone to the extra expense of maintaining a Village Police Department ... [t]he VILLAGE is bisected by the Long Island Expressway, a high speed interstate expressway ... [m]ost of the residences are on two-acre or four-acre parcels ... many of the front doors of the VILLAGE homes do not face directly toward the street. Many have driveways that curve or wind for 100–300 feet ... because of the size and design ... a resident usually cannot see someone walking up his driveway towards the front door because vision is blocked either by the design of the driveway ... or by trees or bushes ... mail is usually delivered in mail boxes ... on posts placed at the curb line of the property ... *These mail boxes and their posts are private property* ... easy escape routes for thieves ... concern about crime prevention ... concerned about privacy ... concerned about the litter" (¶¶ 18–27).

According to the Mayor, the Village acknowledges that it must respect the First Amendment rights of persons who wish to distribute written material within the village, but he adds that the Village must also protect the "residents' legitimate and substantial interests in crime prevention, privacy, prevention of littering, and control of garbage accumulation" (¶ 28). Therefore, Colombo reasons, the regulatory scheme of Chapter 149 is constitutional.

In further defense of the regulatory scheme of § 149–5, which outlines the procedure for obtaining a license to distribute, the Mayor submits that the request for name, address and purpose of the cause for which the license is sought is merely for identification, "which can be of no reasonable objection to anyone" (¶ 36). He also reasons that the request for names and addresses of the officers or directors of the organization as well as for the group's legal and tax status is for identification purposes and accountability if there is a problem. In terms of the time and place of the activity, Colombo maintains that this information is vital for the police. The Mayor also states that it is important for the Village to know whether commissions, fees or wages are to be expended in connection with the activity so that the village can confirm the applicant's status as a genuine charity and avoid the residents being defrauded. Since Chapter 149 is "content-neutral" according to Colombo, neither the mayor nor the Board has any discretion to deny an application for a license once the information and $25 fee are provided.

**B.** *Affidavit of William Doerrie, Chief of Police*

Essentially, Chief Doerrie echoes the concerns of the Mayor, specifically regarding "burglary and theft of automobiles from private property ... the most prevalent crimes in the Village" (Doerrie Affidavit, ¶ 7). In particular, Chief Doerrie states the following:

"Because of the affluence of our residents, the attractiveness of their homes and cars, and the privacy screening around most homes, our Police force is very alert to the potential for burglaries.... [W]e are well aware of how easy it is for burglars to enter a house and escape ... along the Long Island Expressway, Jericho Turnpike, or Glen Cove Road" (¶¶ 7, 10).

The remainder of Mr. Doerrie's affidavit reviews the village and county's "911" program and prevention of burglaries when residents are away on vacation.

### C. *Affidavit of Rosemarie Buscarello, Village Clerk*

Ms. Buscarello addresses the licensing procedure which is implemented once a person/organization makes a request to canvass or solicit in the Village of Old Westbury. According to the Clerk,

"... I respond, in writing, by providing them with a copy of the VILLAGE's licensing requirements ... [t]hereafter, if the individual or group files an application, I review it for completeness, and then give it to the Mayor and Board of Trustees.

7. The application is then placed on the Board of Trustees agenda for its monthly meeting. I notify the applicant of the meeting date and ask that someone attend the meeting to present the application to the Board.

8. To my knowledge, no application for a permit has ever been denied ...

9. With regard to the $25 fee, that amount is a reasonable approximation of the administrative costs involved in processing the application."

In 1979, Ms. Buscarello notes, upon the adoption of the current licensing requirements set forth in Chapter 149, a letter was sent to all of the Village residents advising them that if they did not wish to be solicited by "political action groups, public interest groups and religious groups" (¶ 11), they should so advise the Village Clerk in writing. As a result, the Village Clerk maintains a non-solicitation list grouped by street.

## III. THE GOVERNING LAW

In *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), the Second Circuit set forth the applicable standard in this Circuit in order to obtain preliminary injunctive relief. According to *Jackson Dairy*, the movant must clearly establish the following:

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief" (*id.*).

*See also Alan Skop, Inc. v. Benjamin Moore, Inc.*, 909 F.2d 59, 60 (2d Cir.1990) (per curiam); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989).

A showing of irreparable harm is perhaps considered the single most important requirement (*see Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 [2d Cir.1990]). Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award (*see, e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 [1982] ["The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"]). Also, the applicant must establish more than a mere "possibility" of irreparable harm; rather, it must show that irreparable harm is "likely" to occur (*see JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 [2d Cir.1990]). A preliminary injunction is considered an "extraordinary remedy that should not be granted as a routine matter" (*JSG Trading Corp. v. Tray–Wrap, Inc., supra*, 917 F.2d at p. 80; *see also Patton v. Dole*, 806 F.2d 24, 28 [2d Cir.1986]; *Medical Soc'y v. Toia*, 560 F.2d 535, 538 [2d Cir.1977]).

Finally, Fed.R.Civ.P. 52(a) requires that the district court sufficiently set forth its findings to permit appellate review (*see Society for Good Will to Retarded Children,*

*Inc. v. Cuomo,* 902 F.2d 1085, 1088 [2d Cir.1990]; *Weitzman v. Stein,* 897 F.2d 653 [2d Cir.1990]).

## IV. DISCUSSION

The defendant Village of Old Westbury contends that the plaintiff has no standing to sue in this matter because DSA has not applied for a license and has not been turned down for one. However, in a First Amendment case, one may facially challenge a statute or scheme that delegates overly broad discretion whether or not he has applied for a license (*see City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 [1988] [appellee may bring a facial challenge to ordinance without first applying for, and being denied, a permit]; *see also Sentinel Communications Co. v. Watts,* 936 F.2d 1189 [11th Cir.1991]).

The Village also argues that the plaintiff does not have a reasonable probability of success on the merits because *This Week* is commercial speech. Counsel adds that even if the publication is non-commercial speech (a point which the defendant does not concede), such speech is subject to regulation where there are "substantial governmental interests to be advanced" (Defendant's Memorandum of Law at p. 5).

In reviewing one issue of *This Week,* the Court found a public service announcement cautioning readers not to drink and drive over the New Year holiday and reminding them of the dram shop law. Two subsequent pages were filled with advertisements. A fourth page showed the results of a survey completed in connection with the trial of William Kennedy Smith. Other pages reflected the following items: New Year's Eve fashions; a photo and story concerning the Grumman Hellcat airplane; a community calendar listing December and January events in local theaters, health centers and libraries; a "lifestyles" column addressing people who have trouble socializing at work or school; the "merchant of the week"; information on local eateries; and finally, the crossword puzzle.

In asserting its claim that *This Week* is non-commercial speech, the plaintiff relies on *Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136, 1139 [3d Cir.1982], in which the Third Circuit determined that a community newspaper entitled *Piggy Back* was noncommercial speech for First Amendment purposes, notwithstanding the fact that only a few pages of consumer and community information were included among extensive advertising. Having reviewed the facts as well as the holding of *Ad World, Inc.,* the Court finds the Third Circuit's decision to be directly on point. The Court therefore holds that the content of *This Week* is noncommercial speech.

The defendant further contends that the plaintiff has failed to establish likelihood of irreparable harm. However, it has long been accepted in this Circuit that improper conduct for which monetary remedies cannot provide adequate compensation suffices to establish irreparable harm (*Paulsen v. County of Nassau,* 925 F.2d 65, 68 [2d Cir.1991]; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., supra,* at p. 72). Our courts have held that our "historical commitment to expressive liberties dictates that '[t]he loss of First Amendment freedoms, *for even minimal periods of time, unquestionably constitutes irreparable injury*'" (*Paulsen v. County of Nassau, supra, quoting Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 [1976]) (emphasis supplied).

The plaintiff is faced with the prospect of receiving a summons arising out of the distribution of its newspaper in the Village of Old Westbury without the prior permission of the Village via its licensing requirement. The threat of ongoing enforcement of the code provisions and the potential for continuing summonses exists (*see Youth Int'l Party v. McGuire,* 572 F.Supp. 1159, 1162 [S.D.N.Y.1983]). That threatened injury—the deprivation of the plaintiff's constitutional rights resulting from the defendant's conduct—is ample demonstration of irreparable harm (*see Hull v. Petrillo,* 439 F.2d 1184 [2d Cir.1971] [Mount Vernon ordinance providing that "no person shall sell or peddle any goods ... without first obtaining a license from the city" and paying $15 fee held to be unconstitutional]).

The affidavits proffered by the defendant focus much of their energy on the notion that regulating the distribution of *This Week* will help cut down on potential crime in the Village of Old Westbury, which already suffers from increasing numbers of burglaries, by keeping potential thieves, in the guise of newspaper carriers, out of the neighborhood. However, courts have held that ordinances which curtail the freedom to distribute information to further purposes of crime prevention are unconstitutional (*see Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 [1943]). Again, in *Ad World, Inc. v. Township of Doylestown, supra*, 672 F.2d at 1139, the Third Circuit found that the Township, though wishing to stop the door to door delivery of plaintiff's *Piggy Back* newspaper because the paper was left visible to passers-by and because possible accumulation might tip-off burglars that a home was unoccupied, had failed to provide evidence of a strong connection between accumulation of papers and the incidence of burglary.

The Court finds significant the additional restrictions on a license as outlined in § 149–6 and reiterated by Mayor Colombo. Any license approved granted by the Board is subject to the following restrictions: "(A) All activity must be conducted during reasonable hours established by the Board; (B) Any organization ... shall not have more than six individuals engaged in the activity at any one time; (C) The Board shall not grant permission for the activity with respect to residents who have advised the Board in writing that they do not desire noncommercial solicitation; (D) The license shall be effective for no more than thirty days; and (E) Every individual who engages in the activity shall demonstrate that he is insured against any injury or harm suffered either through negligence or otherwise while engaged in activity authorized by the license ..."

■ Counsel for the defendant Village draws the Court's attention to § 149–5, subdivision C which states the following:

"Upon receiving such application, the Mayor shall present the same to the Board of Trustees at its next regular meeting. The Board of Trustees *shall approve the application of all bona fide applicants who have complied with the above provisions*" (emphasis supplied). The defendant submits that the language "shall issue the license" takes away the element of discretion and thereby eliminates the issue of constitutionality. The Court disagrees and finds that the key language "bona fide applicants" from § 149–5(C) as well as "[s]uch other information as the Board of Trustees may require" from § 149–5(A) places absolute discretion in the hands of the Board.

In *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), the Supreme Court struck down an ordinance that gave a municipal official the right to pass upon applications to distribute literature in the form of circulars or handbooks. The ordinance did not make any specific reference to the content of the literature; however, it still gave the government official the right to bar completely the distribution of particular forms of literature. In striking down that ordinance, the Supreme Court quoted from *Ex parte Jackson*, 6 Otto 727, 733, 96 U.S. 727, 733, 24 L.Ed. 877 (1877) as follows:

"[l]iberty of circulating is as essential to [the right of freedom of speech] as liberty of publishing; indeed, without the circulation, the publication would be of little value" (*Lovell v. Griffin, supra*, 303 U.S. at p. 452, 58 S.Ct. at 669).

In reviewing the facts of the instant case, the Court finds that the plaintiff has established irreparable harm in the ongoing prior restraint exercised by the Village against the plaintiff's distribution of its newspaper.

■ Turning to the second prong of the test—establishing a likelihood of success on the merits—the Court must look to the nature of the property on which the expression at issue occurs. Although the streets of a town may be "narrow and of a residential character, they are nevertheless traditional public fora"; *Carey v. Brown*, 447

U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 [1980]; and therefore municipal ordinances "must be judged against the stringent standards this Court has established for restrictions on speech in such fora" (*Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 [1988], *quoting Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 [1983]).

■ The First Amendment restricts a municipality's capacity to enact laws affecting freedom of expression (*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 [1972]; *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 673 [11th Cir.1984]). In *Grayned*, the Supreme Court stated that "The right to use a public place for expressive activity may be restricted only for weighty reasons. Clearly, government has no power to restrict such activity because of its message. Our cases make equally clear, however, that reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted" (408 U.S. at 115, 92 S.Ct. at 2303).

However, to be permissible, such time, place and manner restrictions must be "content neutral" and "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication" (*United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 [1983]; *Perry Ed. Assn. v. Perry Local Educators' Assn., supra*, 460 U.S. at p. 45, 103 S.Ct. at p. 955).

■ As the Eleventh Circuit noted in *Miami Herald Pub. Co. v. City of Hallandale, supra*, to qualify as narrowly tailored, a content neutral ordinance "must avoid vesting city officials with discretion to grant or deny licenses" (734 F.2d at p. 673). The court went on to note "It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms" (*Miami Herald Pub. Co. v. City of Hallandale, supra*, at p. 673, *quoting Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151, 89 S.Ct. 935, 938–939, 22 L.Ed.2d 162 [1969]).

■ This principle applies in cases where the discretion is exercised by more than one person as well. For example, where a city commission had the right, under an ordinance, to determine whether a license applicant received a business permit or denied him such a license, the court found that this function necessarily involved the exercise of considerable discretion (*id.*). In the area of free expression, a licensing statute placing unbridled discretion in the hands of a government official *or agency* constitutes a prior restraint and may result in censorship (*City of Lakewood v. Plain Dealer Pub. Co., supra*, 108 S.Ct. at 2143) (emphasis supplied). In addition, "accompanying such discretion is the opportunity to discriminate against a licensee on the basis of what the licensee intends to say, which in the context of licensing newspaper distribution raises the spectre of prior restraint" (*Miami Herald Pub. Co. v. City of Hallandale, supra*, at p. 675; *International Society for Krishna Consciousness v. Rochford*, 585 F.2d 263 [7th Cir.1978]).

■ A permit system must "leave no factors to be assessed, judgments to be made, or discretion to be exercised by the appropriate licensing official" (*Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 [1976]). In the context of a first amendment challenge upon the facial validity of a licensing statute, it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant injunction (*Miami Herald Pub. Co. v. City of Hallandale, supra*, 734 F.2d at 674). Broad comprehensive regulations, specifically local ordinances regulating the distribution of literature, have been repeatedly struck down (*Lovell v. City of*

*Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 [1938]; *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 [1939]; *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 [1940]).

The defendant criticizes the plaintiff's reliance upon *City of Lakewood v. The Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), wherein the Supreme Court found a local ordinance regulating the location of newspaper racks to be unconstitutional. The thrust of the criticism focuses on the fact that this was a 4–3 decision, with two Justices not taking part in the case. Notwithstanding the fact that *City of Lakewood* was not a unanimous decision, this Court must recognize that *City of Lakewood* is still the law of the land.

The cases relied upon by the plaintiff establish that there is a constitutional right to freely circulate one's ideas. They also establish the public's right to receive those ideas (*see Authors League of America Inc. v. Oman,* 790 F.2d 220, 223 [2d Cir.1986]).

Finally, there is nothing in Chapter 149 that prevents content censorship, particularly with such an open-ended provision allowing screening for "such other information as the Board of Trustees may require." With this kind of licensing qualification, the Village can reject any applicant for any reason. As this Court held in *Paulsen v. Lehman,* 745 F.Supp. 858 (E.D.N.Y.1990), the speech at issue here clearly implicates First Amendment rights. In addition, in relation to the $25 Village fee for a license, it has long been established that "a state may not impose a charge for the enjoyment of a right granted by the Federal Constitution" (*Hull v. Petrillo,* 439 F.2d at p. 1185, *quoting Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 [1943]). Further, significantly, there is nothing in Chapter 149 which says anything about reasonable time, place and manner restrictions. If left undisturbed, this local law will, in the Court's view, cause the plaintiff to suffer irreparable harm.

It is apparent that the face of the ordinance itself contains no explicit limits on the discretion of the Board of Trustees. The Village asks the Court to presume that the Board will never deny a license application, or that it will do so only for reasons related to the health, safety, or welfare of Old Westbury citizens. This, of course, presumes that the Board will act in good faith and adhere to certain standards presently stated in this law suit—standards which are not set forth in the ordinance. As the Supreme Court has noted, "this is the very presumption that the doctrine forbidding unbridled discretion disallows" (*City of Lakewood v. Plain Dealer Pub. Co., supra,* 108 S.Ct. at p. 2150). This Court cannot presume non-binding limits into a silent ordinance granting the Village unbridled censorship discretion.

The fact that the statute says that the Board of Trustees shall approve the application is watered down considerably, if not totally, by the language "of all *bona fide applicants*" (emphasis supplied). The question is, "Who is a bona fide applicant?" One who leaves newspapers in front of a house on the hook of a mail post possibly attracting burglars? There are no standards for the definition of "bona fide applicants."

Therefore, the Court holds that Chapter 149–4 of the Village Code of Old Westbury constitutes a prior restraint, puts unbridled discretion in the hands of the Village Board of Trustees, and violates the First Amendment of the Constitution of the United States.

## V. CONCLUSION

For all of these reasons, the plaintiff's request for a preliminary injunction is granted. The Village of Old Westbury, its successors, agents, servants, employees, officers, officials, attorneys, and assigns are hereby enjoined from continuing, attempting or threatening to enforce Chapter 149 of the Code of the Village of Old Westbury with regard to this plaintiff, or from taking any action to prevent, interfere with, or threaten the plaintiff, its employees, agents, and assigns from distributing or otherwise delivering the newspaper entitled *This Week* to the residents of the

Village of Old Westbury pending the final hearing and determination of this action.

In accordance with Federal Rule of Civil Procedure 65(c), the plaintiff DSA was advised at oral argument on January 10, 1992, to post a bond in the amount of $5,000 within ten (10) days and to file proof of such undertaking with the Clerk of the Court on or before January 20, 1992.

SO ORDERED.