In re Peter J. HIRSCHHORN, Debtor.

FELLERMAN AND COHEN REALTY CORP., Plaintiff,

v.

CLINICAL PLUS INC. and Dr. Peter J. Hirschhorn, Defendants.

Bankruptcy No. 190–14584–260.
Adv. No. 193–1240.

United States Bankruptcy Court, E.D. New York.

July 7, 1993.

Stangler, Edelman & Binder by Harold J. Stangler, Sachs & Kamhi by Gary Sachs, Carle Place, NY, for debtor.

Department of Justice, Office of U.S. Trustee by Alfred Dimino, Garden City, NY.

Kleinberg, Kaplan, Wolff & Cohen, P.C. by Monica L. Kaiser and David Parker, New York City, for Landlord.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

It is a well-known axiom that the bankruptcy laws are intended to be used as a shield and not as a sword. *Shell Oil Co. v. Waldron,* 785 F.2d 936, 938 (11th Cir.1986) (quoting *In re Penn Cent. Trans. Co.,* 458 F.Supp. 1346, 1356 (E.D.Pa.1978)), *cert. dismissed,* 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986); *In re Lee Road Partners,* 155 B.R. 55, 64 (Bankr.E.D.N.Y.1993) (quoting *Friarton Estates Corp. v. City of*

*New York,* 65 B.R. 586, 594 (Bankr. S.D.N.Y.1966)). This adversary proceeding presents a classic case in which a Debtor seeks to use the bankruptcy laws to smite his landlord. Such behavior will not be tolerated by this Court.

Dr. Peter Hirschhorn, the debtor in this case (the "Debtor" or "Hirschhorn"), is a podiatrist who, up to about two months ago, practiced out of an office in a professional and medical building of which the plaintiff in this adversary proceeding is the landlord. The Debtor has moved from this building to an office across the street where he has continued to practice as a podiatrist. The lease affecting his office in the medical center contains a non-compete clause which prohibits him from practicing podiatry within a six block radius for two years following the termination of the lease. The plaintiff-landlord commenced this adversary proceeding for an injunction to enjoin Hirschhorn from violating the non-compete clause and for damages and costs arising therefrom. The plaintiff also moved this Court on June 25, 1993, for a preliminary injunction which, after a hearing, was granted. Immediately following the granting of the motion and after hearing testimony proffered by the plaintiff and by the Debtor, this Court granted the permanent injunction. Subsequently, on June 28, 1993, this Court entered an Order directing Hirschhorn, within thirty days of the entry of the Order, to vacate the premises to which he had moved and to cease practicing podiatry in a six block radius as provided for by the non-compete clause.

This decision is intended to set forth the findings of fact which lead to this Court's conclusion granting the preliminary and the permanent injunction so as to assist any appellate tribunal to which the Debtor may appeal this decision in making its determination in the event such an appeal is taken.

1. Fellerman–Cohen manages and operates the premises under a lease with the building's owner.

## FINDINGS OF FACT

Fellerman–Cohen Realty Corp. ("Fellerman–Cohen"), whose director and principal is Dr. Kenneth Fellerman ("Fellerman"), is in the business of managing and operating a medical office building complex located in the Bronx, New York (the "Complex").[1] The Complex is occupied by a variety of different health care professionals including a gynecologist, pediatrician, dentist, oral surgeon, dermatologist, and until the Debtor's recent departure, a podiatrist.

On January 1, 1983, Fellerman–Cohen, entered into a Sublease Agreement (the "Sublease") with Clinical Plus, Inc. ("Clinical" or the "Tenant") whereby Fellerman–Cohen agreed to sublease office space (the "Premises") in its Complex to Clinical for use as a podiatry office. Clinical was a New York corporation whose president and sole shareholder was the Debtor. The Debtor also practices at a second office in Brooklyn, New York.

Paragraph 20 of the Sublease provides as follows: "This instrument may not be changed, modified, discharged or terminated orally." Sublease at 2 (Jan. 31, 1983).

An attached Rider to the Sublease, which is signed by Hirschhorn as president of Clinical, contains a non-compete clause in clause 11 which provides as follows:

11. Tenant and its officers, directors and shareholders shall not, during the term of this Sublease and for the two (2) year period beginning on the date of termination of this Sublease, own, operate, become employed by, lease, construct, render services to or for, become interested or purchase, directly or indirectly, a podiatry facility or practice within a radius of six (6) square blocks of the demised premises.

Rider to Sublease at 2–3 (Jan. 31, 1983).

A handwritten rider to the Sublease dated January 31, 1983, states as follows:

The undersigned and the tenant hereby agree that as to the clause # 8(b)[2] they

2. Clause 8, as written in the rider attached to the Sublease, was stricken to the extent that it eliminated subsection (b) referred to therein. The portion remaining reads as follows:

will indemnify the Landlord for reasonable legal fees not to exceed the sum of one thousand dollars ($1,000). It is further understood that the undersigned individual does not personally assume or guarantee the other terms and provisions of the lease.

Handwritten Rider to Sublease (Jan. 31, 1983).

This rider was signed by Fellerman on behalf of Fellerman–Cohen and twice by Hirschhorn, once as President of Clinical and once in his personal capacity.

Prior to January 1, 1990, Clinical was dissolved by operation of law for failure to pay New York State Franchise taxes. Following Clinical's dissolution, the Debtor continued to practice podiatry in the office and otherwise utilize the premises as provided for by the Sublease. He did not notify Fellerman that Clinical had been dissolved and was no longer in existence. However, almost from the inception of the Sublease, all monthly rental payments were made by Hirschhorn and not by Clinical.

On January 1, 1990, Fellerman–Cohen executed an extension of the Sublease until December 29, 1997. The extension was between Fellerman–Cohen and Clinical despite the fact that Clinical had been dissolved at this time. Thus, it is apparent that Hirschhorn was still concealing the demise of the corporation from Fellerman–Cohen.

The extension provided that the provisions of the Sublease remained in full force and effect except as modified. Paragraph 14 of the extension provided as follows: "Changes: 14. This sublease can be changed only by an agreement in writing signed by the parties to the sublease." Sublease at 2 (Jan. 1, 1990).

On October 22, 1990, the Debtor filed its petition seeking relief under Chapter 11 of the Bankruptcy Code. Thereafter, by motion duly made pursuant to § 365(d)(4), the Debtor's time to assume or reject the sub-

ject Sublease and the Brooklyn lease were extended to March 22, 1991. Subsequently, upon further applications by the Debtor, seven additional extensions were granted ultimately extending the time to May 31, 1993. The Debtor justified these extension requests, in all but the first two applications, by asserting that he was embroiled in an adversary proceeding initiated in this Court by one of his creditors, National Union Fire Insurance Company of Pittsburgh, PA. ("National"), which sought the non-dischargeability of its debt as well as the denial of Hirschhorn's discharge. According to the Debtor, the outcome of this proceeding would determine the viability of the Debtor's reorganization.

On May 27, 1993, the Debtor, through its counsel, moved for its ninth extension for the Brooklyn office only. As before, counsel for the debtor cited the adversary proceeding with National as the reason why this extension was necessary. However, a stipulation settling that adversary proceeding had been approved by this Court on May 25, 1993, two days before Debtor's counsel sought the extension. Even more astounding was that counsel for the Debtor had signed the stipulation on May 17, 1993, a full ten days prior to seeking the extension.

On June 25, 1993, a hearing was held on Fellerman–Cohen's motion for a preliminary injunction. Having found that it had successfully shown 1) irreparable injury and 2) a likelihood of success on the merits or a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in its favor as the moving party, *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 135 (2d Cir.1992); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979), the Court granted the motion for a preliminary injunction. Pursuant to Fed.R.Bankr.P. 7065 which incorporates Fed.R.Civ.P. 65(a)(2), the court then held a consolidated hearing on the permanent injunction.

Tenant represents that neither it nor any of its officers, directors or shareholders are a party to or are bound by any agreement, obligation or understanding which (a) would be breached or violated by Tenant's execution or perfor-

mance of this Sublease, or [as noted above, whatever followed the word "or" was stricken from the clause].
Rider to the Sublease at 2 (Jan. 31, 1983).

During the course of the hearing, the Debtor testified that the conditions at the Complex had been deteriorating, that it had become seedy, vermin infested and was in a state of disrepair (the roof leaked), until it was no longer satisfactory for a medical facility. He testified that he had discussed these complaints with Fellerman on many occasions.

The Debtor also testified that he had been attempting to leave the Complex for the last two years. It was his contention that having been given until May 31, 1993, to assume or reject the lease, he decided to reject it before that expiration date. He further testified that he therefore began negotiations to lease new office space directly across the street from the Complex on April 1, 1993. He admitted that he did not inform Fellerman, or this Court of those discussions. On April 15, 1993, he entered into a lease for the office space directly across the street from the Complex. As before, the Debtor did not inform Fellerman or this Court of that decision. When questioned about his actions, the Debtor proffered the incredulous story that the landlord of the new premises had told him on April 14, 1993 that he needed to see the Debtor right away. According to the Debtor's testimony, when he arrived at the landlord's office the next day, April 15, 1993, he was told by the landlord that if he wanted to move in, he had to sign the lease that day.[3]

The Debtor further testified that on or around April 17, 1993, he personally informed Fellerman that he was going to leave the Complex. It was the Debtor's recollection that Fellerman was not surprised and in fact, wanted to know when he was moving as Fellerman had someone who wanted to move in. The Debtor also stated that approximately five days later, Fellerman told him to pay $4,500 rent arrears or he would not be able to continue practicing at the Complex. According to

the Debtor, an argument ensued which culminated in Fellerman yelling at the Debtor while he (Hirschhorn) was treating a patient. Hirschhorn testified that Fellerman came into his office and told the patient "You will have to leave now and you ... [can] see [the Debtor] at his new office around the block." Transcript of June 25, 1993, at 37.

It was Hirschhorn's testimony that when his nurse went to open the office on Friday, April 30, 1993, she found the treatment rooms locked by Fellerman. He stated that he then spoke with Mr. Harold Stangler, Esq., one of his attorneys, who advised him that Fellerman could not keep him from entering his office. The Debtor then testified that he spoke with Fellerman and again told him of his plans to vacate the Complex.

He further testified that on May 3, 1993, he went to the office and with the help of some hired movers, began to remove his belongings. Hirschhorn testified that Fellerman then showed up and told him to "Get out." The Debtor stated that the situation escalated into some pushing at which point, he called the police who instructed Fellerman to allow the Debtor to remove his belongings.[4]

Fellerman disputed significant portions of the Debtor's testimony. He described the Complex's problems as nothing more than the normal, minor maintenance one would have in his own home. It was his recollection that the only complaints the Debtor ever made regarding the Complex were for matters of routine maintenance such an overflowing toilet or broken air conditioner.

Fellerman testified that the Debtor often asked him for extra time to pay the rent. According to Fellerman, Hirschhorn appealed to their friendship and told him how difficult things were going for him. Apparently, as a result of these conversations,

3. Since this lease was not in the ordinary course of business and was entered into without the permission of the Court, this Court will undoubtedly be called upon to determine the validity and effect of such lease.

4. The Debtor also testified that Fellerman refused to allow him to remove certain podiatry chairs which belong to him. However, Fellerman testified that the chairs were installed by him and did not belong to the Debtor.

Fellerman allowed the Debtor to fall behind on his rent. Fellerman further testified that prior to May 3, 1993, he had no knowledge of the Debtor's desire to leave the Complex. Rather, Fellerman recalled many occasions in which the Debtor told him he would still be practicing at the Complex forever. Fellerman emphatically stated that he had never told the Debtor that he would not object to his moving from the Complex.

Fellerman further testified that the Complex was routinely kept locked after business hours as a matter of safety and not to keep the Debtor out. Fellerman also stated that the Debtor possessed a key to the premises. He then testified he did not learn of the Debtor's intention to vacate the Complex until May 3, 1993, when he observed the Debtor and the movers removing things from Hirschhorn's office. To prevent this occurrence, Fellerman testified that he, not the Debtor, called the police.

It was further revealed during the course of the hearing that upon learning of the Debtor's intentions, Fellerman–Cohen notified him by letter dated May 3, 1993, that it elected to terminate the Sublease effective May 8, 1993.

On May 17, 1993, the Debtor began practicing podiatry across the street from the Complex, in violation of the non-compete clause contained in the Sublease and without the express permission of this Court. However, the Debtor was still not finished ignoring the jurisdiction of this Court. After moving into his new office, Hirschhorn proceeded to spend $40,000 on various renovations.[5] Moreover, he then distributed flyers which trumpeted the opening of this new office.

## DISCUSSION

The Debtor argues that the non-compete clause is unenforceable and disfavored as a matter of law. In the event that the clause is legal, the Debtor argues that (1) it has been waived; (2) the indemnification agreement renders it inapplicable to him and (3) it has expired as a matter of law—and cannot be rejected in part.

### A. Reasonableness

■ Under New York law, it is well-established that a covenant restricting competition will be enforced against medical professionals if such covenants are reasonably limited temporally and geographically and without being harmful to the public or unduly burdensome, and serve the acceptable purpose of protecting the employer from unfair competition. *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *Zellner v. Stephen D. Conrad, M.D., P.C.*, 183 A.D.2d 250, 589 N.Y.S.2d 903, 905 (1992); *Penny W. Budoff, P.C. v. Jenkins*, 143 A.D.2d 250, 532 N.Y.S.2d 149, 152, *appeal dismissed*, 73 N.Y.2d 810, 537 N.Y.S.2d 494, 534 N.E.2d 333 (1988).

The Debtor argues that the six block scope of the covenant is geographically unreasonable as the neighborhood outside the six block radius is vastly different from that immediately surrounding the clinic. Accordingly, the Debtor claimed that moving outside the six block zone would disturb his practice.

Notwithstanding the Debtor's protestations, it is abundantly clear that the restrictive covenant at issue is reasonable in duration and geographic scope. Although the Debtor argued that working outside of the six blocks would be detrimental to his practice, during the course of his testimony, he admitted that there are a significant amount of clinics and other doctors who work in this area. Moreover, six blocks is extremely reasonable in light of other New York cases. For example, in *Zellner*, the court upheld a restrictive covenant which prohibited an ophthalmologist from practicing for a two year period within a two mile radius. *Zellner*, 183 A.D.2d 250, 589 N.Y.S.2d 903. In *Budoff*, a restrictive cov-

---

5. The Court is puzzled by the emphasis with which Debtor's counsel heralded the lower rent the Debtor would be paying at its new offices. Considering that the Debtor spent $40,000 renovating this new office, it may be that on a monthly basis, the new office is actually more expensive.

enant barring a doctor from practicing within ten miles of her former partner for two years was upheld. *Budoff,* 143 A.D.2d at 250, 532 N.Y.S.2d at 152. In *Novendstern v. Mt. Kisco Medical Group,* 177 A.D.2d 623, 576 N.Y.S.2d 329 (1991), the court enforced a covenant preventing a physician for competing with former employer within a portion of Westchester county for three years. In light of the above, it is plain that the restrictive covenant barring Dr. Hirschhorn from practicing within six blocks for two years is reasonable.

## B. Enforceability

■ The Debtor relies solely on *Paramount Pad Co. v. Baumrind,* 4 A.D.2d 944, 168 N.Y.S.2d 215, 216 (1957), *aff'd,* 4 N.Y.2d 393, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958), for the proposition that the non-compete clause is unenforceable as it is not ancillary to either a contract for the sale of a business or a contract of employment. The Debtor's reliance is misplaced and obviously stems from a misreading of the case. What the court in *Paramount* actually stated was that:

> An agreement in restraint of trade is unreasonable if based upon a promise to refrain from competition where the promise is not ancillary either to a contract for the transfer of good will or other subject of property or to an existing employment or contract of employment.

*Paramount,* 4 A.D.2d 944, 168 N.Y.S.2d at 216. Here, the Sublease creates a property right in the premises for a defined period of time. Since the non-compete clause is ancillary to the lease/contract, it meets the test set forth in *Paramount. Id.* Moreover, those New York courts which have dealt with non-compete clauses in leases have not found them to be unenforceable as a matter of law. For example, in *Shactman v. Masters–Lake Success, Inc.,* 222 N.Y.S.2d 171 (1961) *aff'd* 16 A.D.2d 679, 227 N.Y.S.2d 247 (1962), the court held that the landlord had properly pled a cause of action to enforce a restrictive covenant contained in a lease which barred a department store from opening another store

within a five mile radius. Moreover, in *Gramercy Park Animal Ctr., Inc. v. Novick,* 41 N.Y.2d 874, 393 N.Y.S.2d 977, 362 N.E.2d 608 (1977), the Court of Appeals considered the enforceability of a non-compete clause contained in a lease of a veterinary practice which was to trigger upon termination of either the veterinary practice lease or a related lease of real property. The court held that the clause was unenforceable, not as a matter of law, but because the term of the lease had expired and the clause by its own terms did not extend beyond the life of the lease. That the Court based its holding on the actual language of the non-compete clause and did not invalidate it as being contrary to public policy, lends further credence to the Court's view that such clauses are enforceable. *See also Evans Prods. Co. v. Decker,* 52 A.D.2d 991, 383 N.Y.S.2d 457 (1976) (restrictive covenant contained in a lease was enforceable).

## C. Waiver

■ According to the Debtor, Fellerman said "Get out" upon hearing of the Debtor's plan to begin practicing across the street. This statement does not constitute a waiver of the non-compete clause contained in the Sublease.

As noted, both the Sublease and the extension agreement contained language requiring any modifications to be in written form. Under N.Y.Gen.Oblig.Law § 15–301 (McKinney 1992), a written agreement which contains such a clause can not be changed by an executory agreement unless such agreement is in writing and signed by the party against whom enforcement is sought. The law is clear that where, as here, the "only proof of an alleged agreement to deviate from a written contract is an oral exchange between the parties, the writing controls." *In re Elsa Designs, Ltd.,* 155 B.R. 859, 870 (Bankr.S.D.N.Y. 1993); *See Nanuet Nat'l. Bank v. Rom,* 96 A.D.2d 898, 466 N.Y.S.2d 68, 69 (1983); *Columbia Broadcasting System, Inc. v. Roskin Distribs., Inc.,* 31 A.D.2d 22, 294 N.Y.S.2d 804, 808 (1968), *aff'd,* 28 N.Y.2d

559, 319 N.Y.S.2d 449, 268 N.E.2d 128 (1971).

## D. Indemnification Agreement

■ At the hearing, the Debtor testified that he believed that the non-compete clause contained in the Sublease did not apply to him. He based this conclusion on an indemnification clause contained in the handwritten rider to the Sublease which as heretofore noted, states as follows:

> The undersigned and the tenant hereby agree that as to the clause ... they will indemnify the Landlord for reasonable legal fees not to exceed the sum of one thousand dollars ($1,000). It is further understood that the undersigned individual does not personally assume or guarantee the other terms and provisions of the lease.

Handwritten Rider to Sublease (Jan. 31, 1983).

■ Under New York law, inconsistent clauses of a contract are to be construed, if possible, in a manner which gives effect to all provisions of the contract. *Spectrum Standards, Inc. v. Telnetex, Ltd.*, 150 Misc.2d 515, 576 N.Y.S.2d 474 (1991). *See also* 22 N.Y.Jur.2d Contracts § 222 (1992). If two clauses of an agreement are so at odds to each other they can not stand together, the clause which is first in the contract will be given effect and the other clause rejected. *Spectrum Standards*, 150 Misc.2d 515, 576 N.Y.S.2d at 475 (quoting 22 N.Y.Jur.2d Contracts § 222 (1992)); *A–Leet Leasing Corp. v. Taurus Trucking Corp.*, 104 Misc.2d 741, 745, 429 N.Y.S.2d 527, 530 (1980).

Here, it is clear that the non-compete clause regarding Clinical was targeted at Hirschhorn. The clause concerns the "the tenant and its officers, directors and shareholders." Since the Debtor was both the President of Clinical and the physician who would actually be practicing at the Complex, it is apparent that the non-compete clause was created to prevent the Debtor

from practicing within a six block radius of the premises. It is equally apparent that pursuant to New York law, the indemnification clause in the handwritten rider to the Sublease can not be used to, nor was it intended to, circumvent the non-compete clause.

■ Moreover, once the corporation was dissolved, Hirschhorn became personally liable for any obligations which the Corporation thereafter incurred. *Bay Ridge Lumber Co., Inc. v. Groenendaal*, 175 A.D.2d 94, 571 N.Y.S.2d 798, 800 (1991); *Brandes Meat Corp. v. Cromer*, 146 A.D.2d 666, 537 N.Y.S.2d 177, 178 (1989). Since the extension was executed subsequently to the corporation's dissolution, it is clear that Hirschhorn cannot use the indemnification clause to nullify the non-compete clause.

## E. Expiration As a Matter of Law

■ One of the more intriguing elements to this proceeding has been why the Debtor, who testified that the Complex was "slum-like" and vermin infested, would continually seek to extend the time within which to assume or reject the Sublease. Clearly, if conditions were truly so pitiful, logic dictates that the Debtor would long ago have rejected the Sublease. However, as will be seen, the extensions were apparently part of the Debtor's ingenious strategy to escape from the non-compete clause.

The Debtor contends that rejection of the Sublease served to render the non-compete clause unenforceable as it can not be severed from the underlying contract. In the alternative, the Debtor argues that the Sublease has expired by its own terms. In support of his contention, the Debtor notes that the lease was deemed rejected pursuant to § 365(d)(4) [6] on May 31, 1993, as the Debtor did not make a further motion to assume or reject the lease or seek another extension of time. The Debtor then claims

---

**6.** Under § 365(d)(4), if the debtor does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected.

that pursuant to § 365(g)(1),[7] the Sublease is deemed rejected immediately prior to the filing of the bankruptcy. Since more than two years have passed since the Debtor filed its petition on October 22, 1990, the Debtor concludes that the non-compete clause has expired by its own terms.

■ The Court joins those other courts which have held that rejection of a lease is not a termination but instead is equivalent to a breach thereof. *Udell v. Standard Carpetland USA, Inc.*, 149 B.R. 908, 911 (N.D.Ind.1993); *Societe Nationale Algerienne v. Distrigas Corp.*, 80 B.R. 606 (D.Mass.1987); *In re Ames Dept. Stores, Inc.*, 148 B.R. 756 (Bankr.S.D.N.Y.1993). Consequently, termination of the Sublease is not a consequence of rejection. *Blackburn v. Sec. Pacific Credit Corp.*, 88 B.R. 273, 276 (Bankr.S.D.Cal.1988). As a result, the non-compete clause emerges unscathed following the rejection of the lease.

In enforcing non-compete clauses contained in leases, bankruptcy courts have used a variety of analyses. In *In re Don & Lin Trucking Co.*, 110 B.R. 562 (Bankr. N.D.Ala.1990), the court held that the debtor remained bound by a covenant not to compete contained in an executory contract which the debtor had rejected. Prepetition, the debtor-lessor leased trucks and drivers to haul freight for the lessee. Under the lease, the debtor could not haul freight or solicit any freight-hauling on its own behalf in any geographic area in which the lessee operated. In addition, the lease stated that the non-compete clause existed through the life of the lease and for another two years following termination (regardless of who terminated). The lease also stipulated that unless prior notice was given by either party, the contract would extend for one year after expiration.

After filing its petition for relief, the debtor began doing business with a competitor of the lessee in violation of the non-compete clause. In November of 1988, the Debtor moved to reject the lease in full.

Since neither the lessee nor the lessor were performing under the contract, the court characterized the contract as burdensome and allowed the debtor to reject it under § 365. However, the court then held that the rejection did not relieve the debtor of the obligation not to compete. In enforcing the non-compete clause, the court noted that there is no statutory language which expressly limits the effect of a debtor's rejection and resulting breach of an executory contract to the right of the other party to file a proof of claim for damages (of questionable worth), rather,

[i]t seems more reasonable to interpret the statute to mean that the debtor can be relieved of performance of burdensome contract provisions tied to the performance of the other contracting party but not the effects of such termination of these executory obligations of the debtor.

*Don & Lin Trucking*, 110 B.R. at 568.

As shown, rejection of the Sublease merely allows Hirschhorn to escape the burden of paying such a high monthly rent; he is free to locate and maintain a new office elsewhere. What rejection does not accomplish is to allow the Debtor to escape from the noncompete clause contained in the Sublease. It remains in full force and effect.

■ Other courts have held that where the only material obligation of the debtor under the lease is a covenant not to compete, the lease is not an "executory contract" subject to rejection. *See In re Noco*, 76 B.R. 839 (Bankr.N.D.Fla.1987) (court held that franchise contract containing noncompete clause was no longer executory and could not be rejected by debtor-franchisee where debtor-franchisee had breached the contract having reaped all the benefits available to him and the franchisor had already met its obligations); *Carstens Health Indus. v. Cooper*, 47 B.R. 842 (Bankr.W.D.Mo.1985) (non-compete agreement is no longer executory once the employment relationship is terminated as the

---

7. Pursuant to § 365(g)(1), the rejection of a lease or executory contract constitutes a breach of such contract or lease which is deemed to have occurred immediately before the date of the filing of the petition.

debtor has no obligation to work and the employer has no obligation to pay). *See also In re Leonard Bluman*, 125 B.R. 359 (Bankr.E.D.N.Y.1991) (holding that an agreement for the sale of the debtor's insurance agency was not an "executory contract," which the trustee had to assume or reject, despite the debtor's continued obligation to abide by a covenant not to compete).

Here, there are no remaining obligations owed by the parties save for Hirschhorn's compliance with the covenant not to compete. He has moved out of the Complex and has allowed the Sublease to be rejected by operation of law. Prior to doing so, he reaped all the benefits of the Sublease available to him. Following his departure, there is nothing for Fellerman–Cohen (the landlord) to do. Thus, the non-compete clause is not an executory contract which may be rejected by the Debtor. Inasmuch as the executory contract cannot be rejected, the Debtor's ingenious argument as to the non-compete clause's expiration fails.

■ As previously noted, the Debtor argues that pursuant to § 365(g), the non-compete clause is deemed to have started running immediately prior to the filing of the petition for relief on October 22, 1990. Thus, the Debtor claims that the clause has expired by its own terms.

This rationale, if followed by the Court, would subvert the policies of the Bankruptcy Code. Section 365(g) is intended to affect only the monetary rights of creditors. It prescribes the rules for the allowance of claims and reflects Congress's belief that such breaches should be treated as prepetition claims and not given administrative expense priority. H.R.Rep. No. 595, 95th Cong., 1st Sess. 349 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 60 (1978), U.S.C.C.A.N. 5787, 5846, 5963, 6305. Section 365(g) does not disturb the equitable non-monetary rights arising from the breach of contract. *In re Carrere*, 64 B.R. 156, 160 (Bankr.C.D.Cal.1986).

■ The Court has an alternative basis for this conclusion. As noted, bankruptcy is intended to be used as a shield and not as a sword. *Lee Road*, 155 B.R. at 64 (quoting *Friarton Estates Corp.*, 65 B.R. 586, 594). In contending that the non-compete clause has expired, the Debtor seeks to use the protective shield of the extensions which were intended to aid the Debtor in its reorganization as a sword with which to stab its landlord.

The Debtor continually extended its right to assume or reject the Sublease for over two years. In seeking the extensions, he argued that they were necessary pending the outcome of a major adversary proceeding. However, this rationale is suspect in light of the Debtor's testimony that he had been searching for a new location for some time. Upon finally locating one, he permitted the lease to be deemed rejected by moving across the street. The Court notes that the stipulation which terminated the adversary proceeding initiated by National was settled for a minimal amount. It is abundantly clear to this Court that the extensions were used to allow the Debtor to continue practicing at the Complex during what the Debtor perceived as the life of the non-compete clause. Once the Sublease was deemed rejected because of his failure to assume it, the Debtor stopped seeking extensions for the Sublease and immediately began practicing across the street from the Complex in the mistaken belief that the non-compete clause was no longer operative. It is clear to this Court that the Debtor was attempting to use the Bankruptcy Code as a means of defeating the non-compete clause. This Court finds that he was totally mistaken and will not allow such behavior in contravention of the Bankruptcy Code.

**F. Injunctive Relief**

■ As noted, the Court had previously determined that Fellerman–Cohen had successfully met the standard for receiving a preliminary injunction. That is, it successfully demonstrated 1) irreparable injury and 2) a likelihood of success on the merits or a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor, *Laureyssens*, 964 F.2d at 135; *Jackson Dairy H.P.*, 596 F.2d at 72.

■ Essentially, the only difference between a preliminary injunction and a permanent injunction is that the plaintiff must actually succeed on the merits. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). Having already demonstrated success on the merits, the Court will analyze the other requirements needed to obtain injunctive relief.

### 1. Irreparable Injury

■ Demonstrating irreparable injury is generally considered the single most important requirement in obtaining injunctive relief. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *Romm Art Creations, Ltd. v. Simcha Int'l, Inc.*, 786 F.Supp. 1126, 1133 (E.D.N.Y.1992). Crucial to a showing of irreparable injury is the unavailability or at least inadequacy of legal remedies. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Distribution Systems of America, Inc., v. Village of Old Westbury*, 785 F.Supp. 347, 352 (E.D.N.Y.1992).

The Debtor argues that Fellerman–Cohen has failed to satisfy this element. The Debtor relies on *Arthur Young & Co. v. Black*, 97 A.D.2d 369, 466 N.Y.S.2d 10 (1983), *appeal dismissed*, 61 N.Y.2d 712, 472 N.Y.S.2d 620, 460 N.E.2d 1105 (1984), for the proposition that the loss of $36,500 of business is not irreparable harm. It is apparent to this Court that counsel for the Debtor has again misread the case law. What the Appellate Division actually stated was that the "plaintiff has hardly shown that the loss of $36,500 worth of business from its $800 million revenues will cause it ... irreparable injury...." *Arthur Young*, 97 A.D.2d at 370, 466 N.Y.S.2d at 11. This Court is in full agreement with that decision inasmuch as the $36,500 amounted to less than one hundredth of one percent of the movant's business. Unlike Arthur Young, Fellerman–Cohen is not a giant conglomerate and as Fellerman testified, its inability to sublease this office to a podiatrist is a crippling blow not only for the landlord but also for the other doctors who will be unable to consult or share referrals with an on-site podiatrist, something they have been able to do for the last ten years.

The Debtor also argues that Fellerman–Cohen could hire another type of doctor such as a neurologist to replace him. However, this is simply not the case. Fellerman testified that the Complex was designed to contain a mix of doctors. He also stated that a podiatrist is an integral part of the complex since they are able to conduct in-office surgery, something that a neurologist or other specialist can not do. Furthermore, he testified that the Debtor's office was designed for a podiatrist; special chairs have been installed, etc. Moreover, prior to its sublease with the Debtor, Fellerman–Cohen had rented this same office to another podiatrist.

As shown, the Complex is designed to house a variety of medical professionals. According to Fellerman, many of them choose to locate their practices in the Complex in order to (1) receive referrals from the other doctors there or (2) to attract walk-in patients from among those visiting the other doctors. In short, the economic success and goodwill of the Complex depends on achieving the proper balance of medical specialties. A vacant office means not only less referrals and less walk-in patients for the other tenants, but it also diminishes the value of the entire Complex.[8]

### 2. Balance of Hardships

Despite the above, the Debtor argues that the balance of hardships weigh in his favor as he has already begun practicing at his new office and has spent $40,000 in renovations. However, asserting hardship on this basis can be likened to the criminal who, after murdering his mother and father, pleads for mercy on the grounds that he is an orphan.

---

**8.** Dr. Fellerman testified that at least one prospective tenant, a podiatrist, decided not to rent in the Complex after learning that the Debtor was operating a podiatry practice across the street.

It is clear that the balance of the hardships actually weigh in favor of granting the injunctive relief. The Debtor's new lease was entered into without leave of this Court. Moreover, the expenditure of funds was likewise without authorization of this Court. It was the Debtor who continually extended the time to assume or reject the Sublease and who did not enter into a new lease across the street until he believed, wrongly so, that the non-compete clause had lapsed. Thus, any hardship which befalls the Debtor results from his own actions in ignoring the requirements of the Bankruptcy Code. It would be manifestly unfair to allow the Debtor to ignore the jurisdiction of this Court and then claim a hardship for doing so. Furthermore, Hirschhorn is not significantly harmed by enforcing the non-compete clause for the next two years. He is entitled to lease a new office, with the permission of this Court, a mere seven blocks from the Complex. In addition, this decision in no way affects the Debtor's practice at his second office in Brooklyn, New York.

Without injunctive relief, Fellerman–Cohen stands to suffer serious damages. For the first time in over ten years, the Complex is without a podiatrist and therefore lacks someone who can do on-site surgery. The Debtor's presence across the street is a source of continuing damage to Fellerman–Cohen as it has been unable to locate a new podiatrist to practice in the Complex.

## CONCLUSION

Having heard the testimony and observed the candor and demeanor of both Fellerman and the Debtor and having examined the memoranda of law and contemplating the reasoning and theories advanced by counsel, the Court makes the following conclusions.

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Having succeeded on the merits and having shown both irreparable harm and the balance of hardships in its favor, Fellerman–Cohen is entitled to a permanent injunction barring the Debtor from practicing within six blocks of the Complex for two years.

3. The parties are directed to schedule a hearing with regards to damages and to determine whether the new lease entered into by the Debtor should be rejected by this Court.

4. The Order of June 28, 1993, is in accordance with the foregoing conclusion except for paragraph 3. As to paragraph 3, Fellerman–Cohen is directed to submit an order for a hearing in accordance with said paragraph.