In re Andrew P. KLEIN d/b/a Kwik-Kopy Printing, Debtor.

KWIK–KOPY CORPORATION, a Division of the International Center for Entrepreneurial Development, Inc., Plaintiff,

v.

Andrew P. KLEIN d/b/a Kwik–Kopy Printing, Defendant,

Bankruptcy No. 96–23338–JKF.
Adversary No. 96–2460.

United States Bankruptcy Court,
W.D. Pennsylvania,
Pittsburg Division.

March 25, 1998.

James L. Weisman, Bradley S. Gelder, Weisman Bowen & Gross, Pittsburgh, PA, for Plaintiff.

F. Scott Gray, Michael Kaminski, Sable, Makoroff & Gusky, Pittsburgh, PA, for Debtor.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court in this chapter 13 case is the Complaint for Injunction to Enforce Covenant Not to Compete filed on behalf of Kwik–Kopy Corporation. Debtor and Kwik–Kopy entered into a franchise agreement dated July 3, 1985. The franchise agreement contained a covenant not to compete with certain restrictions. The limitations at issue involve duration, distance, and scope of activity. On March 7, 1997, an order was entered authorizing Debtor's rejection of the franchise agreement. Debtor no longer operates as a Kwik–Kopy center but continues to operate a printing and copying service at his former Kwik–Kopy location under the name "Mirror Image Printing & Copying". Kwik–Kopy alleges that it will suffer irreparable harm if Debtor is permitted to continue operations at his present location and seeks an injunction in accordance with the terms of the franchise agreement and the covenant not to compete.[2]

---

**1.** The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

**2.** The franchise agreement states that

FRANCHISOR and FRANCHISEE agree that FRANCHISOR would be irreparably damaged in the event that FRANCHISEE should operate a competing business in the trade area served by the KWIK–KOPY Center of this franchise or by any KWIK–KOPY Center franchise, for a period of time after expiration or termination of this Agreement for any reason, and FRANCHISEE further agrees as follows:

. . .

Because of the irreparable injury which will be caused by breach of any one or more of the above provisions of this Article 11.0, FRAN-

Debtor has ceased using Kwik–Kopy trademarks and trademark-protected products.

Debtor filed a counterclaim seeking return of his franchise fee plus all royalties paid (an amount in excess of $200,000) to compensate him for Kwik–Kopy's alleged failure to (1) provide market research, (2) assist Debtor in locating a profitable location, (3) provide specialized training for Debtor or his staff,(4) investigate and determine Debtor's need for equipment, and (5) otherwise comply with the terms of the franchise agreement.[3]

■ Each party argues that equitable estoppel applies to bar the other's claims and Kwik–Kopy asserts that Debtor's claims are barred by the statute of limitations. The franchise agreement was executed in 1985 and the parties operated under it for about 12 years. Because of our ruling on the counterclaim, *infra*, we need not address the statute of limitations argument. In order to prove that equitable estoppel applies, a party must establish (1) a material misrepresentation, (2) reasonable reliance on the misrepresentation, and (3) damages resulting from the misrepresentation. *See, e.g., McCarron v. FDIC*, 111 F.3d 1089, 1097 (3rd Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998). With the exception of evidence that Debtor underreported royalties during a certain period prepetition, a fact not material to the issue now pending, no evidence of misrepresentation was adduced by either side. Therefore, the equitable estoppel argument fails as to both parties.

■ We first address the counterclaim. The testimony of Kevin Camp, vice-president for development for ICED, the holding company for Kwik–Kopy and other franchise systems, testified that Debtor received assistance in, *inter alia*, (1) locating, investigating and developing a business site, (2) developing layout of the space, (3) purchasing equipment, (4) training for himself and his employees, and (5) on-site assistance with interviewing employees. Kwik–Kopy also provides a toll-free telephone number for franchisees to use if they have questions and Debtor used this service.

Debtor admitted that representatives of Kwik–Kopy helped him in locating a site for his business, although the final decision was Debtor's. Debtor attended training sessions and representatives of franchisor visited his business three or four times over 12 years, providing assistance and training. He received manuals and other training documents as well as software. We find that Debtor received the services for which he contracted. Debtor perhaps was dissatisfied, but there was no evidence that the services were in fact inadequate or substandard.[4] Kwik–Kopy provided materials and services in accordance with the franchise agreement. Based on the foregoing, we find for Kwik–Kopy on the counterclaim and judgment will be entered for Kwik–Kopy on Debtor's counterclaim.

Concerning the complaint in which Kwik–Kopy seeks injunctive relief, Debtor contends that (1) the rejection of the franchise agreement effected a rejection of the covenant not to compete, (2) the covenant constitutes a dischargeable claim, and (3) Kwik–Kopy is not entitled to equitable relief inasmuch as an adequate remedy at law exists. To this end, Debtor's plan provides for payment of damages in the form and amount of royalties that Debtor would have owed, had the franchise still operated, for the two-year period

---

CHISEE understands and agrees to issuance of a temporary injunction by a court to protect FRANCHISOR from any breach of the above restrictions.

Exhibit A to Complaint, Kwik–Kopy Center Franchise Agreement at ¶¶ 11.00, 11.06.

**3.** Debtor also contends that, if he pays royalties to Kwik–Kopy under the plan as proposed, he is entitled to the cash equivalent of "Bud Bucks" accumulated under the franchise agreement before rejection. "Bud Bucks" are incentives offered by the franchisor in the form of credits franchisees can use to pay for advertising materials or apply towards conference and seminar

fees. The uncontradicted testimony was that Bud Bucks have no cash value. Further, they are awarded based on the amount of royalties paid. Debtor admitted that he did not pay all the royalties he owed. Debtor has not proved entitlement to a cash equivalent of "Bud Bucks" to a preponderance, and the claim is denied.

**4.** Debtor claims that the franchise agreement is void or voidable because Kwik–Kopy failed to provide consideration. Based on our findings regarding the counterclaim this argument is without merit.

after the date Debtor filed his chapter 13 petition, allegedly representing the duration of his obligation under the covenant not to compete.[5]

Under the terms of the franchise agreement, the two-year period of the covenant arises on termination or expiration of the franchise agreement. The parties produced no evidence to show that this agreement has been terminated and, by its terms, it has not expired. Rejection of an executory contract is not the equivalent of termination of the contract. It is only a breach. *See In re Columbia Gas System, Inc. (Enterprise Energy Corp. v. U.S.),* 50 F.3d 233, 239 n. 8 (3rd Cir.1995). *See also Matter of Austin Development Co.,* 19 F.3d 1077 (5th Cir.), *cert. denied sub nom. Sowashee Venture v. EB, Inc.,* 513 U.S. 874, 115 S.Ct. 201, 130 L.Ed.2d 132 (1994); *In re Modern Textile, Inc.,* 900 F.2d 1184 (8th Cir.1990). Once the franchise agreement is breached, the question becomes whether enforcement of the covenant is required.

## I. *What is the Effect of Rejection of the Franchise Agreement on the Covenant Not to Compete?*

The franchise agreement looks to Texas law for resolution of issues related to its construction. No Texas bankruptcy case addresses the question of whether rejection of a contract effects rejection of a covenant not to compete contained therein. Reported cases from other jurisdictions differ in their conclusions. *In re Hughes,* 166 B.R. 103 (Bankr. S.D.Ohio, 1994)(in dicta, rejection of an executory contract does not terminate rights arising from the contract); *In re Hirschhorn,* 156 B.R. 379 (Bankr.E.D.N.Y.1993)(rejection of executory contract does not render covenant unenforceable). *See also In re Noco,*

*Inc.,* 76 B.R. 839 (Bankr.N.D.Fla.1987)(only remaining obligation was debtor's to not compete; held covenant not an executory contract, cannot be rejected). *Compare Silk Plants, Etc. Franchise Systems, Inc. v. Register,* 100 B.R. 360 (M.D.Tenn.1989)(covenant is rejected with franchise); *In re Rovine Corp.,* 6 B.R. 661 (Bankr.W.D.Tenn.1980)(rejection of franchise agreement included rejection of covenant).

In *Silk Plants, Etc. Franchise Systems, Inc. v. Register,* 100 B.R. 360 (M.D.Tenn. 1989), the court held that the covenant was rejected with the franchise because there was no evidence that the parties intended the covenant to be a separate contract. Similarly, the evidence in the instant case did not establish that this covenant is a "separate" contract. Thus, it is not subject to acceptance or rejection independently of the franchise agreement.[6]

Case law in the Third Circuit, which governs this Debtor's ability to assume or reject an executory contract, does not permit a debtor to reject parts of the whole. In *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36 (3d Cir.1989), the Court of Appeals for the Third Circuit ruled that the entire contract must be assumed or rejected. Thus, in rejecting the franchise agreement, Debtor rejected the covenant. However, the very purpose of the covenant is to govern the relationship between the parties *after* the demise of the underlying contract, even though the covenant is not an executory contract in and of itself. Although executory contracts must be assumed or rejected in their entirety, the importance of the covenant, as ancillary to the franchise agreement, comes to the fore

---

5. We note that the plan provision with respect to damages relating to breach of the covenant does not include a separate component of damages for rejection of the franchise agreement. We make no findings as to whether Kwik–Kopy has suffered damages as a result of the rejection of the franchise agreement, as that issue is not raised in this complaint.

6. If the covenant were a separate contract, it could not be rejected because the only obligation remaining is Debtor's duty not to com-

pete. A contract is executory when substantial performance remains due by both parties and the failure of either to perform would constitute a material breach excusing the other party's performance. *In re Columbia Gas System, Inc. (Enterprise Energy Corp. v. U.S.),* 50 F.3d 233, 239 (3rd Cir.1995). *Cf. In re Noco, Inc.,* 76 B.R. 839 (Bankr.N.D.Fla.1987)(debtor's obligation under noncompetition agreement could not be rejected unless the entire franchise agreement was executory).

upon rejection of the franchise agreement.[7] We, therefore, conclude that the covenant remains effective despite the rejection, to the extent that it is enforceable under applicable law. We must decide whether the covenant is enforceable, either as is, or as reformed, and whether it constitutes a dischargeable claim.

## II. Is the Covenant Not to Compete Enforceable Under Applicable Law?

■ The franchise agreement provides that Texas law applies. Section 15.50 of the Texas business and commercial statutes states the criteria for enforceability of covenants not to compete:

> Notwithstanding Section 15.05[8] of this code, a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

V.T.C.A., Tex. Bus. & Com. § 15.50. The purpose of the covenant is not to put the franchisee out of business. It is to protect the goodwill or other business interest of Kwik–Kopy. Texas statutory law requires the covenant to be written as narrowly as possible so the restraints imposed on the franchisee are not greater than necessary to achieve the goal of protecting the franchisor's interests. Because the franchise agreement was not one for personal services, Debtor has the burden of establishing that the covenant

does not meet the criteria of § 15.50. V.T.C.A. § 15.51(b).[9]

### A. Reasonableness of Limits on Time, Scope of Activity, and Geographic Are

#### (1) Time.

■ The covenant as written prohibits Debtor from participating in any way in the "printing, reproduction or related services business or other business offering such services" for two years within a three mile radius. Kwik–Kopy Center Franchise Agreement at § 11.01, Exhibit A to Complaint. Kevin Camp, vice president for development for ICED, the holding company for Kwik–Kopy and other franchise systems, testified that it is difficult to market a new franchise when a former franchisee remains in operation in the area. He testified that it takes approximately two years for a new franchise to be in full operation: one year to market the franchise and a second year for the new franchise to build up business. Camp acknowledged, however, that Kwik–Kopy's marketing efforts are based on advertisements placed to solicit inquiries from potential franchisees, that Kwik–Kopy has not marketed in the Pittsburgh area since 1985, and that it has no specific plans to do so now. Because of Debtor's volume of business, Camp opined that this franchise might be marketed, but he was unaware of Kwik–Kopy's marketing plan or of any marketing effort for it or for the Pittsburgh area. Although Camp testified that, as a general rule, Kwik–Kopy replaces franchisees when a franchise terminates, he was not aware of any plans or efforts to replace Debtor's operations, even though Debtor's lease of his current premises expires in August of 1998.

---

7. Under Texas law, the covenant must be "ancillary to or part of an otherwise enforceable agreement". V.T.C.A. § 15.50. "Ancillary" is defined as "auxiliary". Webster's II New Riverside Dictionary at 106 (1984). "Auxiliary" is defined as "supplementary". Id. at 140. Neither party disputes that the covenant herein is "ancillary to" the franchise agreement.

8. This section concerns monopolies, trusts, and conspiracies in restraint of trade.

9. Section 15.51(b) provides:
   If the primary purpose of the agreement to which the covenant is ancillary is to obligate

the promisor to render personal services, ... the promisee has the burden of establishing that the covenant meets the criteria specified by Section 15.50 of this code. If the agreement has a different primary purpose, the promisor has the burden of establishing that the covenant does not meet those criteria. For the purposes of this subsection, the "burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence. V.T.C.A. § 15.51(b).

No evidence was produced by Kwik–Kopy concerning negotiations or plans to negotiate for an extension of the lease at this site.

Debtor has not asserted that a two-year restriction would be unreasonable, but the evidence established that Kwik–Kopy has not marketed a franchise in the area since 1985 and has no plans of record to replace Debtor's franchise with another, regardless of how long Debtor would be prohibited from competing. Thus, the two-year limitation is not a controlling factor in this analysis, although the time period, standing alone, is not unreasonable.

### (2) Scope of Activity.

Enforcement of the covenant would result in Debtor's being enjoined from involvement

> either directly or indirectly, by virtue of being an employee, proprietor, a partner, stockholder, agent, through family relationships or by financing or investing in same, with a competing printing, reproduction or related services business or other business offering such services franchised hereunder within the trade area served by the KWIK–KOPY Center of this franchise and any KWIK–KOPY Center franchise.

Kwik–Kopy Center Franchise Agreement at ¶ 11.01, Exhibit A to Complaint. Debtor testified that his business is not different in any material way from other copying centers. To be competitive and keep his business he must be flexible in pricing because there are two other copying businesses nearby: one within 100 feet, another within 100 yards.

Furthermore, Camp testified that the number of franchisees has been decreasing in recent years because, due to technical advances, more short-term, low-end home and business jobs are being done in-house. Therefore, Kwik–Kopy is changing its business practices to cover long-term, high-end projects. There was no evidence that Debtor's business emphasis will change in keeping with Kwik–Kopy's changing business practices. Accordingly, Debtor's existing operations would not compete with Kwik–Kopy's

new business practices, even if Kwik–Kopy were to acquire a new franchisee.

The restriction on the scope of Debtor's activity is reasonable in the abstract but not as applied in this case because Kwik–Kopy does not plan to compete with respect to the same services that Debtor performs. Thus, the restriction on the scope of Debtor's activities is unreasonable.

### (3) Geographic Area.

Debtor testified that if an injunction is granted and he is forced to move three miles away to comply with the covenant not to compete, his business would be devastated. He would lose one of his two employees, could not fund his chapter 13 plan, and would incur large moving expenses, including between $1,500 and $2,500 to move the press and other equipment. His lease expires in August of 1998 and his landlord is one of his better customers. A move would result in increased expense in serving his existing customers and the loss of his repeat walk-in trade. Much of his 80 percent repeat business is walk-in trade from the area. Approximately 30 percent of his total business consists of people coming in off the street. His customers include businesses located, with few exceptions, within a mile from his store.[10] To require Debtor to relocate would destroy his ability to fund his chapter 13 plan and is an unreasonable restriction in light of the fact that Kwik–Kopy has produced no evidence of any plan to market another franchise here or to keep Debtor's current location when his lease expires. The three-mile restriction is, at best, of de minimis value to Kwik–Kopy in this situation. Because Kwik–Kopy has not marketed and does not intend to market in this area, an injunction prohibiting Debtor from competing within a three-mile area from his current location is unreasonable as well. However, the restriction prohibiting Debtor from operating within three miles from any other Kwik–Kopy franchise is reasonable and will be enforced.

---

**10.** The exceptions are limited and include a customer in Monroeville and another in Squirrel Hill, both areas some miles away from his business location.

## B. Does the Covenant Impose a Restraint Greater Than is Necessary to Protect Any Business Interest of Kwik–Kopy?

Kwik–Kopy's witness, Kevin Camp, testified concerning Kwik–Kopy's business interests. He opined that if the covenant is not enforced, Kwik–Kopy will lose royalties and name recognition and that it will suffer an inability to market its name and its business practices in the Pittsburgh area. The number of franchisees in the area, Camp testified, affects the ability to market because franchisees want to know that the franchisor will maintain the system. In addition, he stated that potential franchisees will look at the success of the franchisees in the area in deciding whether to become involved. In his view, any remarketing effort is stymied when competition in violation of a covenant not to compete exists, and the overall effect is detrimental to the expansion of the franchise system. However, Camp admitted that Kwik–Kopy has only one other franchisee in the entire Pittsburgh area (located more than three miles across the city from Debtor), has not engaged in marketing in this area since 1985, and has no plans to market here. Furthermore, there were only six Kwik–Kopy franchises in the entire state of Pennsylvania (including Debtor's). The evidence established that Kwik–Kopy has not been marketing, is not marketing, and has no plans to market its name, products or service in the Pittsburgh area and, therefore, we find that its asserted inability to market if the covenant were not enforced has not been proven to a preponderance in this case.

Camp also testified that Kwik–Kopy is shifting the nature of its operations from the low-end type of business Debtor conducts to the high-end business described above and we find that Debtor's current business practice would not compete with Kwik–Kopy's new focus. With respect to Kwik–Kopy's concern about name recognition, Debtor has been operating under another name for some time and there was no evidence adduced at trial that Kwik–Kopy's name is now subject to confusion by the public. We find from this evidence that Kwik–Kopy does not enjoy wide-spread name recognition and the as-

pects of "goodwill" associated therewith within the Pittsburgh marketing area.

Camp stated that what is unique to Kwik–Kopy is its training, trademarks, logos, pricing and annual seminars and conferences for franchisees. Camp acknowledged that for the past three years or so, Kwik–Kopy has not utilized proprietary accounting software and its franchisees are encouraged to use accounting software that is readily available commercially. Nothing in Camp's testimony established that Debtor would be in a position to use any product or service unique to Kwik–Kopy since the rejection of the franchise agreement and Debtor has stopped using Kwik–Kopy's trademarks and logos.

Kwik–Kopy adduced testimony that Debtor had no experience in the copy business before he became a franchisee and that the training and support he received from Kwik–Kopy enabled him to use its business methods to make the business profitable as soon as possible. However, the testimony failed to establish anything about Debtor's general business operations that is proprietary to Kwik–Kopy or unique to the copy services provided by Debtor, as opposed to another copy service company. Debtor benefitted from the training and business planning assistance provided by Kwik–Kopy and paid for those services in the form of a franchise fee and royalties under the contract. Accordingly, the injunctive restraint Kwik–Kopy seeks to impose on Debtor is greater than that necessary to protect Kwik–Kopy's business interests.

However, we find that Kwik–Kopy has a legitimate business interest in protecting its name, logos and trademarks, all of which Debtor no longer uses. To protect Kwik–Kopy's rights in the future, Debtor will be enjoined from using the Kwik–Kopy name, logos, trademark, and trademark protected products.

Because the covenant is unreasonably restrictive and, in the aforementioned respects, imposes a restraint greater than that necessary to protect Kwik–Kopy's business interests, we must decide whether it should be reformed. From the testimony at trial, we find that Kwik–Kopy's only other business interest that would be entitled to protection

if the franchise still operated is its right to royalty payments. We find that this right can be protected through reformation of the covenant.

### III. *Reformation of the Covenant under § 15.51(c) Permits the Award of Damages to Kwik-Kopy*

When it is possible to reform an unreasonable and unnecessarily restrictive covenant so that it complies with § 15.50, reformation of the covenant is required by Texas law. V.T.C.A. § 15.51(c). Section 15.51(c) provides:

> If the covenant ... contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation....

V.T.C.A. § 15.51(c). This statutory provision mandates reformation of the covenant if the promisee has a business interest that is worthy of protection. In order to protect Kwik-Kopy's interests in its name, logos, trademarks, trademark-protected products, and royalties, the covenant can be made to comply with the criteria of § 15.50 by reforming it to prohibit Debtor from establishing or participating in, in any location other than his current tenancy, within a three-mile radius of any other Kwik-Kopy franchise, a "printing, reproduction or related services business or other business offering such ser-

vices" for two years from March 7, 1997, the date the franchise agreement was rejected.[11] With these changes to the covenant, Kwik-Kopy's legitimate business interests are protected without imposing an unreasonable restraint or one greater than necessary on Debtor's scope of activity or the place and time within which it can be conducted.

Section 15.51(a), in conjunction with § 15.51(c), provides that the court may award the promisee, Kwik-Kopy, damages once the covenant is reformed. Having reformed the covenant, we will *require Debtor* to pay royalties to Kwik-Kopy for two years from the date the franchise agreement was rejected, as well as enjoining the activities detailed above. *See* note 11 *supra.* Royalty payments for this period represent an administrative expense, in lieu of the injunctive relief that would be imposed absent reformation. To establish the amount owed, Debtor shall submit to Kwik-Kopy all reports and documents to establish the royalty as though he still operated a Kwik-Kopy franchise. The provisions of the injunction and the payment of royalties will protect Kwik-Kopy's business interests while not unreasonably restricting Debtor's business activities.

Accordingly, Debtor shall be entitled to carry on his business under the new name, Mirror Image Printing & Copying but is enjoined from using the Kwik-Kopy name, logos, trademarks, or trademark-protected products and items and from conducting a competing business for two years from the date the franchise agreement was rejected from any location, other than his current leased premises, that is within three miles of any Kwik-Kopy franchise.

### IV. *Does the Covenant Constitute a Dischargeable Claim?*

We reject Debtor's assertion that the covenant constitutes a claim dischargeable in this chapter 13 case. Rather, we find that the royalties payable during the two-

---

11. Because the covenant was not operative until Debtor rejected the franchise agreement, we substitute the date of rejection for the contractual provision of termination or expiration and for Debtor's plan proposal of the date of the bankruptcy filing. The royalties to be paid in lieu of injunctive relief do not constitute damages for rejection of the franchise agreement, nor do they substitute for any unpaid, pre-rejection royalties or Kwik-Kopy's prepetition claim. They are instead an administrative expense necessary to operation of the business, substituted under the reformed covenant for unreasonably restrictive injunctive relief that would destroy the business and Debtor's ability to fund his chapter 13 plan.

year covenant period are administrative claims. While Debtor operated under the franchise agreement, the covenant was dormant. Only when Debtor rejected the contract and ceased operating under the franchise agreement did the covenant take effect and questions of its applicability and enforceability arise. Although rejection of an executory contract "constitutes a breach of such contract ... immediately before the date of the filing of the petition", 11 U.S.C. § 365(g)(1), the effect of the covenant was not operative until rejection, which occurred postpetition. The obligation to pay royalties for breach of the covenant is a postpetition, actual and necessary expense to preserve the estate. 11 U.S.C. § 503(b)(1)(A). Thus, it is an administrative claim which must be paid in full through the plan. 11 U.S.C. § 1322(a)(2).