**In re ANC RENTAL CORPORATION, INC., et al., Debtors.**

**No. 01–11200(MFW).**

United States Bankruptcy Court, D. Delaware.

May 23, 2002.

Bonnie Glantz Fatell, Mark J. Packell, Blank, Rome, Comisky & McCauley LLP, Wilmington, DE, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Debtors and Debtors-in-Possession.

Brendan Linehan Shannon, Sean M. Beach, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Duane D. Morse, Wilmer, Cutler & Pickering, Tysons Corner, VA, for Official Committee of Unsecured Creditors.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Orla E. Collier, Benesch, Friedlander, Coplan & Aranoff, LLP, Columbus, OH, for Avis Rent–A–Car System, Inc.

Ian Connor Bifferato, Bifferato, Bifferato & Gentilotti, Wilmington, DE, for The Hertz Corporation.

Frederick B. Rosner, Cozen and O'Connnor, Wilmington, DE, Mark S. Gamell, Torre, Lentz, Gamell, Gary & Rittmaster, LLP, Jericho, NY, for Liberty Mutual Insurance Co.

Mark D. Collins, Paul N. Heath, Richards, Layton & Finger, P.A., Wilmington, DE, for Congress Financial Corporation.

William P. Bowden, Ashby & Geddes, Wilmington, DE, for Lehman Brothers, Inc.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motions of the Debtors for authority to assume and assign to ANC Rental Corporation, Inc. ("ANC") certain executory contracts and leases of National Car Rental System, Inc. ("National") and to reject certain executory contracts and leases of Alamo Rent-a-Car, L.L.C. ("Alamo") at the following airports: Houston (International); Manchester, New Hampshire; and Raleigh–Durham, North Carolina.[2] The Motions were opposed only by Avis Rent A Car System, Inc. ("Avis") and The Hertz Corporation ("Hertz").[3] For the reasons set forth below, we grant the Motions with respect to the Manchester, New Hampshire, and Raleigh–Durham, North Carolina, airports but continue the Motion with respect to the Houston (International) airport.

### I. FACTUAL BACKGROUND

On November 13, 2001, ANC and several of its subsidiaries, including National and Alamo (collectively "the Debtors"), filed voluntary petitions under chapter 11 of the Bankruptcy Code. Prior to the filing, National was in the business of renting cars primarily to business travelers and Alamo was in the business of renting cars primarily to vacation travelers. Both National and Alamo operated concessions at more than 70 airports, pursuant to concession and related agreements (collectively "the Concession Agreements") with the various governmental entities responsible for concessions at those airports ("the Airport Authorities"). The Concession Agreements were usually granted after open bidding pursuant to applicable statutes and regulations. Concessionaires were typically required to provide financial and operating information to the Airport Authorities with their bids, which included an agreement to pay percentage rent subject to a minimum annual guaranteed rent ("the MAG"). The Airport Authorities accepted bids and usually granted preference in location to bidders with the highest MAGs. Other than the MAGs, the Concession Agreements typically contained identical terms for all concessionaires at a specific airport.

Subsequent to the bankruptcy filing, the Debtors determined to consolidate the Na-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The Debtors also filed a Motion with Respect to the Concession Agreement at the Charleston, South Carolina, airport, which was heard at the same hearing as the instant Motions. Since that Motion was opposed by

the Airport Authority and involves unique issues, we will deal with it separately.

3. Although Liberty Mutual Insurance Company ("Liberty") also filed a limited objection to the Motions, that objection is resolved if certain language is included in the proposed orders granting the relief requested by the Debtors, to protect Liberty's rights as surety under bonds posted at the airports in question.

tional and Alamo operations at the airports. To do so, they decided to reject one Concession Agreement at the airport and to assume the other Concession Agreement and assign it to ANC. ANC in turn would receive a license from both National and Alamo to operate under each of those brands at one location at the airport.

The Debtors have filed numerous Motions in pursuit of their consolidation program. Avis and Hertz have filed objections to each Motion. On January 25, 2002, after a hearing on the Debtors' Motion relating to the Concession Agreements at the Cincinnati Airport, we issued a bench decision overruling the objections of Hertz and Avis and granting the Debtors' Motion. After hearings on March 13 and 15, 2002, we overruled objections by Hertz and Avis and entered orders on March 20, 2002, granting similar Motions of the Debtors with respect to the following airports: Pittsburgh, Hartford, Detroit, Huntsville–Madison County, Jacksonville and Springfield–Branson. Subsequently, by Opinion and Order dated May 3, 2002, we overruled the Hertz and Avis objections and granted the Debtors' Motions with respect to four additional airports: Melbourne, Florida; Las Vegas, Nevada; Memphis, Tennessee; and Houston, Texas (the Hobby Airport). Those Motions had been filed on March 8, 2002, and had been the subject of a hearing held on March 27, 2002.

The Motions before the Court now were filed on March 23, 2002, and heard on April 10 and 11, 2002. By these Motions, the Debtors seek to assume and assign the National Concession Agreements to ANC, which will operate at the airports as a licensee of both the National and the Alamo brands. Alamo does not have a Concession Agreement at either the Manchester or the Raleigh–Durham airport. At Raleigh–Durham, the Concession Agreements have expired, but National and the other car rental agencies there have been operating on a month to month basis under the same terms as their expired Concession Agreements. At the Houston (International) airport, the Debtors seek to assume and assign the existing National Concession Agreement as well as the National Concession Agreement which is due to go into effect in the future, once a shared facility for the car rental agencies is finished. The Debtors also seek to assume and assign a Master Special Facilities Lease Agreement between the Houston Airport Authority and National, on which other rental car companies are also signatories. Post trial briefs and proposed findings of fact and conclusions of law were filed by the parties to the pending Motions on April 19 and 26, 2002.

## II. *JURISDICTION*

This Court has jurisdiction over these Motions, which are core proceedings pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (M), and (O).

## III. *DISCUSSION*

### A. *Standing*

■ The Debtors objected to our consideration of the objections of Hertz and Avis, asserting neither has standing to be heard on the Motions. Although we had permitted Hertz and Avis to press their objections at the hearing, we agree with the Debtors that they have no standing to be heard on the Motions relating to the Manchester and Raleigh–Durham airports for the reasons set forth in our May 3 Opinion.

Hertz and Avis argue, however, that the May 3 Opinion on standing is premised on an erroneous finding of fact that neither Hertz nor Avis asserts it is a creditor, a contention the Debtors do not dispute.

■ This fact, however, was not central to our decision on standing. As we noted in the May 3 Opinion, even creditors do not have standing to raise the rights of a landlord or contract party under section 365. *See, e.g., In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir.1992)(creditor which held mortgage and assignment of rents in building which debtor had sold and leased back from landlord had no standing to enforce provision of § 365 which requires debtor to assume or reject an unexpired lease of non-residential real estate within 60 days of bankruptcy filing). While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another. *Id.* at 169. Consequently, a general creditor such as Avis does not have standing to assert the rights of the Airport Authorities under section 365(c) and/or (f).[4]

Hertz also argues that the Debtors have conceded, and the Court has already held, that Hertz and Avis have standing to be heard on these issues. At the hearing held on January 25, 2002, we heard both the Debtors' Motion to assume and assign the Concession Agreement at the Cincinnati airport as well as Motions for relief from the stay filed by Hertz and Avis to permit them to sue the Debtors in state court to prevent that assignment. At that hearing, the Debtors argued that the issues raised in the state court litigation were the very issues before the Court on the Debtors' Motion to assign the Cincinnati Concession Agreements. Because we agreed, we denied the requested stay re-

lief. However, that was not a ruling that Hertz and Avis had standing to be heard on the section 365 issues. Instead we merely ruled that it was the province of the Bankruptcy Court to determine whether the Debtors could assign the Concession Agreements under section 365 and that the efforts of Hertz and Avis to sue the Debtors in state court to prevent them from exercising those rights was not permissible. We made no ruling that Hertz and Avis had standing to be heard on the section 365 issues.[5]

■ Hertz also asks for the Court to permit them to be heard on these issues under Federal Rule of Bankruptcy Procedure 2018(a) which allows the Court in its discretion to permit a party to be heard on a matter where it does not otherwise have standing. *See, e.g., In re Penn Central Transp. Co.*, 455 F.2d 976, 976 (3d Cir.1972)(interpreting prior rule). However, we decline to permit such intervention in this case. While Hertz and Avis have an economic interest in the Motions, it is not the type of economic interest which the Bankruptcy Code seeks to protect. It is their interests as competitors of the Debtors which they are seeking to protect by opposing action by the Debtors which will improve the Debtors' chances of successfully reorganizing. Those interests are not in harmony with the Debtors or the creditors of these estates and there is no reason to let Hertz and Avis use this forum to advance their individual interests.

■ However, the Houston (International) airport presents a different situation. At that airport, the Debtors seek to

---

4. A creditor may be heard on a section 365 motion on issues which impact its interest as a creditor. Those would include the issue of whether the Debtors' exercise of their business judgment in deciding to assume or reject an executory contract was appropriate.

5. We did, however, allow Hertz and Avis to be heard at that hearing since no one objected to their standing. That does not, however, give them standing to be heard on every subsequent section 365 motion filed by the Debtors.

assume and assign two National Concession Agreements (one currently in effect and one to go into effect in the future) as well as a Master Special Facilities Lease Agreement. The Houston Airport Authority is building a facility (anticipated to be completed in 2003), which will be shared by all the car rental agencies who have Concession Agreements. The Master Special Facilities Lease Agreement between the Houston Airport Authority and the car rental agencies who have Concession Agreements will govern the use of that facility. In addition, there are separate agreements among the car rental agencies who are concessionaires at that airport, including an Operating Agreement, a Memorandum of Understanding, and a Members Agreement (collectively "the Shared Facilities Agreements"). (*See* Avis Exhibits 3, 4 & 5.) The Shared Facilities Agreements govern various aspects of the future operation of the shared facility, including the concessionaires' obligation to pay its share of (i) the bonds issued to pay for the construction, (ii) the cost of operating the bus service for customers from the airport to the car rental facility, and (iii) the cost of running the shared facility in the future. Hertz and Avis are parties to the Shared Facilities Agreements, as are National and Alamo. Hertz and Avis argue that the assumption and assignment of the Concession Agreements to ANC will change the party with whom Hertz and Avis have contracted in the Shared Facilities Agreements (and possibly the terms of those contracts). Thus, they argue that they have standing to be heard on the Motion to assume and assign the Concession Agreements and at the Houston (International) airport. Further, Avis argues that it has standing to be heard on the Motion to assume and assign the Master

Special Facilities Lease Agreement since it is a signatory to that contract.

We agree. With respect to the Master Special Facilities Lease Agreement, Avis as a signatory to that contract has standing to be heard on the Motion to assume and assign it. Further, the Shared Facilities Agreements are integrally related to the Concession Agreements at the Houston (International) airport because one cannot be a member of the limited liability corporation which operates the shared facility unless one has a Concession Agreement at the airport. It is unclear whether the Debtors will attempt to assume and assign those agreements to ANC. If they do, Hertz and Avis will clearly have standing to be heard on those Motions. If they reject the Shared Facilities Agreements, it may impede ANC's rights under the Concession Agreements which are sought to be assigned to it today. Consequently, we conclude that Hertz and Avis have standing to be heard on the issue of whether the Concession Agreements at the Houston (International) airport can be assumed and assigned.

### B. *Prior Rulings*

■ The Debtors argue that the present Motions must be granted based on our prior decisions with respect to the Cincinnati Motion and the May 3 Opinion. However, for the reasons stated in our May 3 Opinion, we conclude that no principle of law mandates the granting of these Motions without consideration of the specific facts and legal issues raised therein. The parties to the present Motions are not the same as those involved in the prior Motions and the facts relevant to each Concession Agreement are unique.[6] There-

---

6. The Debtors' argument, if extended, would mandate that any time the Court granted a motion to assume an unexpired lease of non-residential real estate, the issue would be decided in the case for all other leases. That is absurd.

fore, we consider each according to its own merits.

### C. *Section 365(c)(1) Is Not Applicable*

None of the Airport Authorities at the airports which are the subject of the Motions before us now have affirmatively consented to the Debtors' Motions, although they have not objected. The Debtors assert that affirmative consent by the Airport Authorities is not necessary because section 365(c)(1) is not applicable. Instead, the Debtors assert that compliance with the general provisions of section 365(f) are all that is required.

Section 365(c)(1) provides:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

■ As we stated in our May 3 Opinion, we follow the majority of courts addressing this issue and conclude that, for section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue. *See, e.g., Perlman v. Catapult Entertain-*

*ment, Inc.* (*In re Catapult Entertainment, Inc.*), 165 F.3d 747, 750–51 (9th Cir.1999)(patent law renders non-exclusive patent licenses personal and non-assignable under § 365(c)(1)); *City of Jamestown v. James Cable Partners, L.P.* (*In re James Cable Partners, L.P.*), 27 F.3d 534, 537 (11th Cir.1994)(city ordinance prohibiting assignment of cable franchise without city approval was mere general prohibition against assignment and insufficient to constitute applicable law under section 365(c)(1)); *In re West Electronics, Inc.*, 852 F.2d 79, 83 (3d Cir.1988)(contract for the manufacture of military equipment was personal services contract which was non-assignable under government anti-assignment statute and § 365(c)(1)); *Cajun Elec. Members Comm. v. Mabey* (*In re Cajun Elec. Power Co-op., Inc.*), 230 B.R. 693, 708–09 (Bankr.M.D.La.1999)(state law that prohibited transfer of assets without majority vote of the members of electric cooperative did not prevent assumption and assignment of contracts where identity of party was not central to the contract); *In re Lil' Things, Inc.*, 220 B.R. 583, 591 (Bankr.N.D.Tex.1998)(§ 365(c)(1) not applicable to Texas statute which is "merely a general prohibition against assignments made without consent of the lessor"); *In re Fulton Air Service, Inc.*, 34 B.R. 568, 573 (Bankr.N.D.Ga.1983)("A lease for improved real property does not constitute a contract for nondelegable personal service" and therefore does not fall under exception of § 365(c)(1)).

■ In this case, we do not find that the statutes in question fit the exception of section 365(c)(1). The statutes merely provide that it is the Airport Authority with whom a concessionaire must deal in order to operate. *See, e.g.,* N.C. Gen.Stat. §§ 63–4, 63–53(3), 63–83; N.H.Rev.Stat. Ann. §§ 422.16, 422.23; Tex. Transp. Code

§§ 22.001 *et seq.*; Houston Code of Ordinances §§ 9–141 *et seq.*

Although the concessions are located at the airports, public safety concerns are not implicated by the question of who runs a car rental service as opposed to who operates an airline, as was the case in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983).

Hertz characterizes the test of whether a contract fits within the purview of section 365(c) as whether the contract is a personal contract, namely "one in which the offeree is vested with discretion in accomplishing the assigned tasks because his skills, knowledge, experience and expertise are unique to the area and could not be duplicated by others not similarly qualified." (Hertz Memorandum at pp. 36–37, *citing Knudsen v. Torrington Co.*, 254 F.2d 283, 286 (2d Cir.1958); *In re Terry*, 245 B.R. 422, 426 n. 10 (Bankr. N.D.Ga.2000).)

Even under that test, though, the Concession Agreements are clearly not personal contracts. The Concession Agreements were not granted only to one unique party; instead they were awarded to numerous car rental agencies often pursuant to public bidding. *See, e.g.*, Tex. Loc. Gov't Code § 252.021; Houston Code of Ordinances § 2–58(a).[7] Further, there is no evidence that only the Debtors could perform the Concession Agreements or that the Debtors have any special skill in this area. While the bid requirements did inquire into the operational experience and the financial health of the bidders, there is no indication that a specific or unique skill

was necessary to receive an award or that the identity of the Debtors was crucial to the granting of the Concession Agreements.[8] In contrast to a personal services contract where generally only one party will do (*i.e.*, Pavarotti), the Concession Agreements in question here did not depend on the specific identity of the concessionaire. Instead, it appears that the principal consideration in accepting bids was not the identity of the bidder but the amount of the MAG. It does not appear that in awarding a contract to National, the Airport Authorities wanted only National (as opposed to Hertz or Avis or Alamo) at that specific location.

Consequently, we cannot conclude that the Concession Agreements are personal contracts pursuant to which only one particular company is capable of performance. *See, e.g.*, *In re Klein*, 218 B.R. 787, 791 (Bankr.W.D.Pa.1998)(franchise agreement to operate a copy center was not for personal services and could be assigned); *In re Fastrax, Inc.*, 129 B.R. 274, 278 (Bankr.M.D.Fla.1991)(contract to install computer system was not personal services contract because it could be performed by another company in the industry even though the debtor might have been the best one suited to the task).

This conclusion is bolstered by the fact that none of the statutes pursuant to which the Concession Agreements were awarded even preclude assignment of those Agreements or require the Airport Authorities' consent to such an assignment. *See, e.g.*, N.C. Gen.Stat. §§ 63–4, 63–53(3), 63–83;

---

**7.** Apparently, neither the Manchester nor the Raleigh–Durham Airport Authorities must use competitive bidding in granting Concession Agreements, although the Manchester Airport Authority must contract for services "prescribing the same minimum standards for reasonable rent or fees." N.H.Rev.Stat. Ann. § 422.23.

**8.** To the extent there is any issue about the ability of the assignee to perform under the contract, that issue is more properly addressed when considering whether the Debtors have shown adequate assurance of future performance, discussed more fully below.

N.H.Rev.Stat. Ann. §§ 422.16, 422.23; Tex. Transp. Code §§ 22.001 *et seq.;* Houston Code of Ordinances §§ 9–141 *et seq.* Thus, the statutes themselves do not demonstrate any overriding concern for the exact identity of the party with whom the Airport Authorities contract.

Further, the Concession Agreements themselves do not prohibit assignment [9] and in many instances contemplate that someone other than the concessionaire would perform them.[10] For example, the Concession Agreements state that they are binding on the parties and their successors and assigns. *See, e.g.,* Exhibits D–1A at § 14.10, D–1B at § 13.15, D–1C at § 14.10, D–1A at § 29.1[sic].[11]

As one of the Debtors' secured creditors, Liberty has raised an additional indicia of the free assignability of the Concession Agreements. Liberty notes that many of the Airport Authorities, as a condition to making an award, require the concessionaires to post a surety bond to secure their performance. Under surety law, in the event of a default by the concessionaire, the surety has the right (and obligation) to complete performance under the agreement. *See, e.g., Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 137, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962)(recognizing surety's common law rights of subrogation in event it completed performance of contract); *In re Modular Structures, Inc.,* 27 F.3d 72, 74 n. 1 (3d Cir.1994)(on default of contractor, surety steps into its shoes to complete performance).

Our conclusion that the identity of the party was not crucial is further supported by the fact that none of the Airport Authorities has opposed the relief requested in the Motions. They are apparently content to have ANC substituted as a party to the Concession Agreements. None has raised identity, performance or public safety concerns with the proposed assignment. Consequently, we conclude that section 365(c)(1) is not applicable to the Concession Agreements.

**D. *Section 365(f) Requirements***

■ In order to assume and assign an executory contract or unexpired lease under section 365(f), the debtor must establish that the decision is one made in its sound business judgment. *See, e.g., In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D.Del.1999).

**1. *Manchester and Raleigh–Durham***

■ In this case the Debtors have established such a sound business purpose for consolidating the National and Alamo operations at the Manchester, New Hampshire, and Raleigh–Durham, North Carolina, airports. The Debtors estimate that consolidation will result in considerable expense reduction and/or revenue enhancement (almost $1.8 million annually for these two airports). At Manchester, there will be no cost savings because Alamo is not currently operating at that airport (onsite or off-site). Nonetheless the Debtors

---

**9.** The mere fact that the Concession Agreements require the consent of the Airport Authorities to any assignment is irrelevant, since such a provision is of no effect under section 365(f)(1).

**10.** At least one court has held that the inclusion in such a contract of the ability to assign the contract, under certain circumstances, constitutes a waiver of the right to assert that the contract in non-assignable under section

365(c). *See, e.g., Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)* 6 F.3d 492, 496 (7th Cir. 1993).

**11.** The Raleigh–Durham agreement has two §§ 29.1; the one dealing with assigns appears to be more correctly referred to as section 30.1.

project additional revenues from ANC's operating both the National and the Alamo brands at that airport because National and Alamo attract different customers (business versus leisure). The Debtors' witness also testified that actual results at airports where consolidation had been permitted and implemented were in excess of the Debtors' original projections.

■ Having met the threshold requirement of a sound business purpose, the Debtors must also cure any existing defaults and provide adequate assurance of future performance of the assigned contracts. The Debtors have agreed to cure any defaults (pre- or post-petition) on the contracts to be assumed. On the issue of adequate assurance of future performance, the Debtors presented evidence that ANC has an oral license to operate under the National and Alamo brands and that former National and Alamo personnel have been hired by ANC to conduct its operations at the same airports. In addition, to the extent the Concession Agreements require that a bond be posted to secure performance, ANC has agreed to do so and has the agreement of its bonding company, Liberty, to provide the requisite bonds.

Further, the Debtors argue that the increased revenues they project will improve the condition of ANC so that it is much more financially secure than either National or Alamo are today, making ANC able to perform the obligations due under the Concession Agreements.

■ Further, the assignment of the Concession Agreements to ANC will not materially modify the Concession Agreements. None of the Concession Agreements (or the requests for bids pursuant to which the Concession Agreements were awarded) expressly forbid the operation of a car rental agency which uses two brand names, *e.g.*, dual branding.[12] In the absence of such language we cannot conclude that the assignment of the Concession Agreements to ANC which will operate under two brands modifies (or is prohibited by) those Agreements.

### 2. *Houston (International)*

However, the Motion to assume and assign the Houston (International) airport Concession Agreement presents a different situation. As noted, the car rental agencies which have Concession Agreements at that airport are also parties to a shared facilities agreements.

Until that is heard, the Court cannot determine if the shared facilities agreement is necessary to the Debtors' operations at that Houston (International) airport or if it can even be assumed over the objection of the other parties to the contract. If the Debtors do not seek to assume and assign the shared facilities agreements, however, it may adversely impact ANC's ability to operate at that airport. We are unable, therefore, at this stage to determine whether assumption and assignment of the Houston (International) Concession Agreement is an appropriate exercise of the Debtors' business judgment.

### IV. *CONCLUSION*

For the foregoing reasons, we grant the Debtors' Motions to Assume and Assign the National Concession Agreement to ANC at the Manchester, New Hampshire, and Raleigh–Durham, North Carolina airports. We defer any ruling on the Debtors' Motion with respect to the Houston

---

12. In fact, the Houston (International) Concession Agreement provides that two operators who merge or consolidate may not use more than one area, thereby suggesting that in that case dual branding may be required. (Exhibit D–3D at § 3.09.)

(International) airport Concession Agreements until a Motion is filed to assume or reject the other agreements relating to operations at that airport.

An appropriate order is attached.

## ORDER

AND NOW, this **23RD** day of **MAY, 2002,** upon consideration of the Motions of the Debtors for authority to assume and assign to ANC Rental Corporation certain executory contracts and leases of National Car Rental System, Inc. and to reject certain executory contracts and leases of Alamo Rent–a–Car, L.L.C. at the Manchester, New Hampshire, and Raleigh–Durham, North Carolina airports, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motions with respect to the Manchester, New Hampshire, and Raleigh–Durham, North Carolina airports are GRANTED; and it is further

**ORDERED** that the Motion with respect to the Houston (International) airport is **CONTINUED** pending a decision by the Debtors whether to assume or reject the other contracts relating to operations at that airport; and it is further

**ORDERED** that notwithstanding anything to the contrary herein, Liberty Mutual Insurance Company is hereby deemed to have reserved and has in no way waived any and all rights, interest, defenses or remedies under or in connection with surety bonds issued by Liberty, or to be issued by Liberty, including without limitation, those which arise under contract, statute or by operation of law, by virtue of equitable lien, equitable subrogation or otherwise.